[No. 25934. *En Banc.* March 25, 1937.]

FRANCES POUNDSTONE, as *Administratrix, et al., Respondents,* v. V. I. WHITNEY *et al., Appellants,* WILLARD WESTMORELAND *et al., Defendants.*[1]

[1]Reported in 65 P. (2d) 1261.

*Theodore B. Bruener,* for appellants.

*E. S. Avey* and *C. D. Cunningham,* for respondents.

MAIN, J.—This case presents four separate actions for damages resulting from an automobile collision. The four actions were consolidated for trial and are so treated upon the appeal. Prior to the time of trial, defendant Claude Lynch defaulted. Thereafter, the court, trying the case without· a jury, made findings and conclusions, based upon which judgments were rendered for the respective plaintiffs against all the defendants. Later, the judgments were vacated as to the defendant Willard Westmoreland. The defendants Whitney and wife, only, have appealed from each of the judgments so entered.

The crucial question in the case is whether Lynch, who was the driver of the offending car, was, on the occasion of the accident out of which the injuries arose, acting within the scope of his employment.

The facts of the case, as evidenced by the testimony, are as follows: For some years prior to July 4, 1934, appellant V. I. Whitney maintained a place of business in Montesano for the sale of new and secondhand automobiles, principally Pontiacs and Chevrolets. In connection with that business, Whitney also conducted a parts and service department, including a paint shop, repair shop and washrack. In the combined business, he employed a number of salesmen, office assistants, mechanics and ordinary laborers. Among the salesmen were C. L. Knight and Russell Walker, who worked on a commission basis. Defendant Willard Westmoreland was employed as a shop mechanic and

worked on a time basis. Defendant Claude Lynch, who had been employed in the business for about a month prior to the accident, was a car washer and helper and, as such, was paid by the hour.

The organization, with Whitney as its directing head, appears to have been complete in every detail. The employees were directed to be on the lookout for prospective buyers and to report any customer leads and information concerning them to the head of the business or to the salesmen. Whenever a prospect was thus reported, the matter was turned over to Whitney or to one of the salesmen, who were the only persons that had authority to make sales.

On July 4, 1934, the Elma Post of the American Legion was sponsoring a celebration at the county fairgrounds, situated about a mile and a half east of the business section of Elma. A few days before that occasion, the committee in charge had asked Knight, one of appellants' salesmen, to furnish several automobiles for the parade which was to take place at the fairgrounds at two o'clock in the afternoon of the fourth. Knight, thinking that it would be a good thing from an advertising standpoint to have the cars in the parade, took the matter up with Whitney. At first, Whitney was not very enthusiastic about the proposal, because he did not think that the display of the automobiles would be of any sales value. However, he finally acceded to the request, provided that there should be no expense to him. He himself did not attend the celebration, but agreed that Knight should have full responsibility and, likewise, full authority in the matter.

With this understanding, arrangements were made by Knight to provide three cars for the parade; two Pontiacs and one Chevrolet. Lynch and Westmore-

land were to drive two of the cars, and another driver was to be selected for the third.

On the morning of the fourth, Knight met Lynch and Westmoreland at the garage where the cars were stored. A driver for the third car not then being readily available, Lynch suggested that his wife would be glad to drive it. Knight acceded to this, saying that "he would just as soon they would be all women drivers in the parade."

The three drivers having thus been designated, Knight's instructions to them were that they should drive the cars slowly from Montesano to the fairgrounds, where he would meet them and arrange for participation in the parade; and that, after the parade, the same drivers should take the cars back to the garage in Montesano.

At about ten o'clock in the morning, Mr. and Mrs. Lynch and Westmoreland started with the cars, driving first to Lynch's home, where breakfast was served. At Elma, the entire party stopped at a general merchandise store conducted by J. J. Ladley, a brother-in-law of Lynch. Mrs. Ladley was present at the store and served a lunch to Mr. and Mrs. Lynch. During the stay at the store, Lynch discussed with Mr. Ladley the merits of the Pontiac car. Mr. Ladley was interested in the purchase of a new car, but Mrs. Ladley was not, although she was an experienced driver.

At the suggestion of Mr. Ladley, Lynch endeavored to interest Mrs. Ladley in a Pontiac car and invited her to go with the party to the fairgrounds and either ride or drive in the parade. Mrs. Ladley could not leave the store at the time, but stated that, if Lynch would return for her at one o'clock, she would go with him and ride in the parade.

The three drivers then proceeded with the cars to the fairgrounds. Knight failed to meet them, as he

had agreed, on their arrival. It appears that he had gone to the fairgrounds earlier in the forenoon and, while waiting for the cars, was attending a ball game which was in progress, as a part of the celebration, on a distant part of the grounds. The three drivers parked their cars some little distance inside the entrance to the fairgrounds, and the two men drivers then proceeded to dust them off and get them ready for the parade. After completing these preliminaries, Lynch endeavored to find Knight in the fairgrounds, but was unable to locate him.

Mrs. Lynch reminded her husband of his engagement with Mrs. Ladley. Thereupon, Lynch, with Westmoreland accompanying him, took one of the Pontiac cars to go to Elma, a distance of about one and one-half miles. At the entrance gate, Lynch saw Russell Walker, one of appellants' salesmen, who was serving as a committeeman in the celebration. Lynch told Walker that he was going to get Mrs. Ladley and at the same time asked Walker to keep an eye on the other two cars. Walker said that he would. Up to this time, Lynch and Knight had not contacted each other.

On the way to Elma, and at a point nearly a mile from the fairgrounds, the car driven by Lynch collided with an automobile driven by Earl J. Poundstone, who at the time was accompanied by his minor daughter, Beverly Jane Poundstone, and Edward F. Murphie and his minor daughter, Wanda Leigh Murphie. As a result of the collision, Mr. Poundstone and his daughter were killed, and Mr. Murphie and his daughter were injured. The Poundstone car was demolished. It was for these injuries and damages that the four actions were brought.

Prior to the trial, the parties to this appeal entered into a stipulation wherein these appellants admitted

that they were the owners of the car driven by Lynch, and that Lynch, at the time of the collision and immediately before, was driving at an excessive rate of speed and on the wrong side of the road; but appellants did not admit liability for the negligence of Lynch. No question is raised herein as to the amounts of the judgments, the only question being, as already stated, whether Lynch was, at the time of the collision, acting in the course of his employment.

For the purpose of this decision, it will be assumed, without so deciding, that the presumption of liability arising by reason of the fact of the appellants' ownership of the car at the time the accident happened was overcome by the testimony in the case, and, as a result, the presumption is no longer a matter for consideration. This, however, does not dispose of the appeal.

There is another question to be considered in determining whether Lynch, at the time the accident occurred, was within the scope of his employment on that particular day. The rules by which courts are guided in determining whether an employer is liable for the result of the employee's negligence are well understood. The difficulty comes in applying these rules to a particular state of facts.

Whether an employee, at the time the act was done for which the employer was sought to be held liable, was within the scope of his employment, depends upon whether the act had been expressly or impliedly authorized by the employer. In addition to this, the employer is liable if the act complained of was incidental to the acts expressly or impliedly authorized or indirectly contributed to the furtherance of the business of the employer. *McQueen v. People's Store Co.*, 97 Wash. 387, 166 Pac. 626; *De Leon v. Doyhof Fish Products Co.*, 104 Wash. 337, 176 Pac. 355; Re-

statement of the Law of Agency, American Law Institute, A, p. 510; 3 Cooley on Torts (4th ed.), p. 68.

In the case now before us, Lynch and two others were to drive the automobiles to the fairgrounds in accordance with the plan worked out by Knight, the salesman. Lynch drove one of the cars, and it was his duty to report to the salesman or to his employer prospective customers. On the way to the fairgrounds, he discovered such a customer, but Mrs. Ladley, not being able to accompany him at the time, arranged for him to return for her later in the day. It was on this return trip that the accident happened.

The purpose of taking the automobiles to the fairgrounds was for exhibition, demonstration and sale. In returning for Mrs. Ladley, Lynch was doing an act which was merely incidental to the acts he was authorized to perform and which would indirectly contribute to the furtherance of the business. On this day, he was not acting as a car washer.

■ The fact that Lynch was performing an unauthorized act does not defeat a recovery.

In *Loux v. Harris,* 226 Mich. 315, 197 N. W. 494, it is said:

"Selling gasoline was a part of defendant's business and, therefore, within the scope of Wagner's employment. Wagner violated instructions in taking the gasoline to the stranded renter of one of defendant's cars. In doing this was he about the business of defendant or was his act a severance in and of itself of his relation to his master's business? Was he driving on his master's business? Certainly he was not driving on his own affairs. Disobedience of how to handle business placed in his charge did not relieve the master. The liability of defendant depends upon whether Wagner, in taking gasoline to the renter of one of defendant's cars, was acting within the scope of his employment. . . .

"Wagner was authorized to sell gasoline at the

garage. He made a sale of what he was employed to sell but delivered the article in disobedience of instructions given him by his master, and employed defendant's vehicle in doing so, contrary to the master's instructions. He was, therefore, about his master's business but acting in a forbidden way. Wagner's disobedience in not notifying the defendant and in leaving the garage and using the automobile did not place him outside of the scope of his employment."

In *Smith v. Yellow Cab Co.*, 173 Wis. 33, 180 N. W. 125, it is said:

"If it were true that a servant is outside the scope of his employment whenever he disobeys the orders of his master the doctrine of *respondeat superior* would have but scant application, for the master could always instruct his servant to use ordinary care under all circumstances. The servant's negligence would therefore always be contrary to orders and the nonliability of the master would follow. But such is not the law. The servant is within the scope of his employment when he is engaged in the master's service and furthering the master's business though the particular act is contrary to instructions. The purpose of the service rendered by the employee, and not the method of performance, is the test of whether or not the servant is within the scope of his employment. If the purpose is to further the master's business and not that of the servant, the latter is within the scope of his employment though he be negligent or disobeys orders as to the method of its execution. [Citing authorities.]"

In *Luckett v. Reighard*, 248 Pa. 24, 93 Atl. 773, Ann. Cas. 1916A, 662, it is said:

"The test of liability is whether the servant at the time of the plaintiff's injury was acting within the scope of his authority in furtherance of his master's business. The master, however, may not be relieved of liability for the tortious act of his servant when acting for him in furthering his business, although he is acting contrary to instructions and the act was done by the servant at a place to which the performance

of his duty did not necessarily call him. The master is responsible for the negligent acts or omissions of his servants in the course of their employment, though unauthorized or even forbidden by him, and although outside of their 'line of duty,' and without regard to their motives: 1 Shear. and Red. on Negligence (6th ed.), Sec. 146; *Moon v. Matthews,* 227 Pa. 488; *Marcus v. Gimbel Bros.,* 231 Pa. 200; *Penas v. Chicago, Milwaukee & St. Paul Ry. Co.,* (Minn) 30 L. R. A. (N. S.) 627."

The judgment will be affirmed.

HOLCOMB, MILLARD, BLAKE, and GERAGHTY, JJ., concur.

STEINERT, C. J. (dissenting)—I accept the statement of the case as set forth in the prevailing opinion, with the following additional facts disclosed by the record:

The sale of automobiles was the primary purpose of appellants' business. To that end, *salesmen* were given regular training courses, with complete instructions as to the best methods of contacting the public and inducing sales. Those employees, however, who were not members of the sales force, such as Westmoreland and Lynch, one of whom was a mechanic and the other a car washer, received general instructions only as to their particular work, with the added direction to be on the lookout for prospective purchasers, but to refer all customer leads to the head of the business or else to one of the salesmen. Only Whitney and the salesmen had authority to make sales. Neither Lynch nor Westmoreland had anything to do with the sale of cars or with the demonstration of them to prospective purchasers, nor were they given any instructions or authority in those respects upon the particular occasion with which we are here concerned.

The reason why Knight, the salesman, did not contact Lynch, the driver, at the fairgrounds, is strikingly

revealed by the record. Shortly after the arrival of the cars at their destination, Lynch met an acquaintance and went with him, in one of the cars, to a beer parlor outside the fairgrounds. During the absence of Lynch, Knight appeared at the place where the other two cars were parked and inquired for him. Learning that Lynch had taken one of the cars to go upon an errand of his own, Knight endeavored to locate him in the fairgrounds, but was unable to do so. Lynch did not return until nearly one o'clock, and, then, on being reminded by his wife of his engagement with Mrs. Ladley, immediately set out upon the trip which resulted in the fatalities. This was without the knowledge or consent of either Knight or Whitney.

The question of presumption of liability arising from appellants' ownership of the car is out of the case, since the majority assumes that the legal presumption was overcome by the testimony adduced. While I am convinced from the record that the presumption was, as a matter of fact and of law, overcome, it is unnecessary to deal with that question, inasmuch as the majority concedes it for the purpose of the argument.

The majority opinion correctly states that the ultimate question to be determined is whether Lynch, at the time of the accident, was within the scope of his employment.

The legal principles on which the majority relies are contained in the following paragraph of the opinion:

"Whether an employee, at the time the act was done for which the employer was sought to be held liable, was within the scope of his employment, depends upon whether the act had been expressly or impliedly authorized by the employer. In addition to this, the employer is liable if the act complained of was incidental to the acts expressly or impliedly au-

thorized or indirectly contributed to the furtherance of the business of the employer.''

No criticism can be made of the first sentence of this statement, nor of the second, provided that the ''incidental'' act is related to an act or acts which the employee is *expressly or impliedly authorized to perform.* The concluding portion of the statement, however, reading, ''or indirectly contributed to the furtherance of the business of the employer,'' is incorrect, if considered disjunctively, because the mere fact that an act of the employee may indirectly contribute to the furtherance of the employer's business does not, of itself alone, furnish a basis of liability, and the authorities do not so hold.

In order to render the master liable for the act of the servant, it must appear, not only that the act of the servant was in furtherance of the master's business, but also that it was within the authority conferred upon the servant.

In support of its comprehensive statement of the rule, the majority cites the following authorities: *McQueen v. People's Store Co.,* 97 Wash. 387, 166 Pac. 626; *De Leon v. Doyhof Fish Products Co.,* 104 Wash. 337, 176 Pac. 355; Restatement of the Law of Agency, American Law Institute, A, p. 510; 3 Cooley on Torts (4th ed.), p. 68.

The two cases above cited are, in my opinion, an unfortunate selection; and the two texts, when carefully analyzed, do not support the application of the rule to the facts involved, as has been done in the majority opinion.

In *McQueen v. People's Store Co., supra,* a truck driver, employed to deliver merchandise, invited two girls to ride upon the running board of his truck. While the truck was in motion, one of the girls jumped, or was thrown, therefrom and was injured. A judg-

ment for recovery of damages was, on appeal, reversed with instructions to dismiss the action. Upon the question of whether the driver was acting within the scope of his employment, this court said:

"While no decisive test can be given for determining whether or not a given act is within the scope of a servant's employment, it is apparent from all the authorities that the act complained of must have been done while the servant was engaged in doing some act *under authority from his master; not that, while engaged in the act, he is employed in the master's business;* but the act must have been in the furtherance of the master's business *and* such as may be fairly said to have been either expressly or impliedly authorized by the master." (Italics mine.)

The act done must, of course, be "in furtherance of the master's business," but in addition to that, it must be done by authority of the master, expressed or implied. It is not for the employee to determine what will further the master's business. He is, in any event, circumscribed by the authority given him and, within that circumscription, must also act in the furtherance of his master's business.

In *De Leon v. Doyhof Fish Products Co., supra,* the superintendent of a cannery had charge of the general conduct of the business. Among his duties was that of maintaining discipline and quelling strikes and uprisings at the plant. He was allowed a broad discretion, and in such matters the policy of the company was intrusted to him. One of the employees was suspected of breeding strife and inciting the crew to strike. The evidence of the plaintiff in the case was to the effect that, on a particular occasion, the superintendent had summoned him and, after some verbal altercation, had falsely accused him of inciting other employees to strike, and thereupon had wantonly and maliciously struck him. The reasoning upon which the

court arrived at an affirmance of the judgment of recovery is expressed in this language:

"When a party is sued for assault and battery by his servant upon another, liability must depend either upon proof of an express direction, or upon such facts and circumstances as will imply direction or authority, and this inference may be drawn by the jury from competent attending facts and circumstances; and if a servant is engaged in the discharge of his duties to the master and is acting for the betterment or well-being of his business, and in so doing wantonly or maliciously injures another, the master is liable to the person so injured. Having given its servant general power to maintain discipline within the bounds of his own discretion, the appellant made itself, under the elementary principles of the law, liable for an abuse of that power. The superintendent was transacting the business of the master when he called respondent to his presence, and the superintendent undoubtedly assumed that he was doing the will of his master when he talked to the respondent and called him to account for what he understood that he had been doing. His object was to promote the welfare of his master's property, and all witnesses agree that the means employed were effective, for there was no further trouble of any kind. In the performance of that which was proper and justified by the circumstances, and to serve no purpose of his own, and without any justification, as the jury has found, the servant allowed his passion to overcome him and maliciously assaulted the respondent."

In the same case, the line of demarcation between liability and non-liability in a given instance is aptly drawn in these words:

"And when a servant goes outside of his employment and wantonly inflicts an injury upon a third person to whom the master owes no duty, the servant is the principal and the employer will not be liable; but where the master has given a servant a general authority, and in the exercise of that authority the servant negligently or maliciously injures another,

the act complained of was done in the course of his employment, and,

" 'The master . . . will be deemed to have consented to and authorized the act of the servant, . . .' "

Thus, it appears that the particular act of the servant must be in the furtherance of the master's business, but, even then, it is not binding upon the master unless the servant is expressly or by implication *authorized* to do the act.

Converting the majority's citation of Restatement of the Law of Agency, American Law Institute, A, p. 510, into quotation, we find the following:

"An act may be incidental to an authorized act, although considered separately it is an entirely different kind of an act. To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that a servant might do."

At this point, it is pertinent to observe that Lynch's sole employment and authority, on the day in question, was to drive one of the cars to the fairgrounds and there await further orders. He had no authority whatever to solicit customers or to make an independent trip for that purpose. In short, he was a driver, not a salesman.

The last of the above citations made by the majority is 3 Cooley on Torts (4th ed.), § 396, p. 68. The first paragraph of the section on that page reads as follows:

"It is apparent from the foregoing discussion that, where it is established that the relation of master and servant exists between the defendant and the person whose act caused the injury complained of, the determination of the question whether the master may be held liable depends on whether the servant, at the time, was acting within the general scope of the pur-

poses for which he was employed. 'In determining whether a particular act was done in the course of a servant's employment, it is proper to inquire whether he was at the time serving his master. The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred, or fairly implied from the nature of the employment and the duties incident to it; and, in determining the question of authority, we are to regard the object, purpose, and end of the employment.' "

Again, it will be observed that, while the inquiry must consider whether the employee was at the time serving his master, the real test is whether the act was committed by authority of the master expressly conferred or fairly implied from the nature of the employment and the purpose incident to it.

The basis for holding a master liable for the torts of his servant rests upon the maxim, *qui facit per alium facit per se,* which underlies the principle of *respondeat superior,* and the universal test of the master's liability is whether there was authority, express or implied, for doing the act. In applying the rule based upon this maxim and principle, respectively, it is necessary to note the distinction between authority granted and instructions given.

"Authority, the sum total of the powers committed or permitted to the agent by the principal, may be limited in scope and such limitations are themselves a part of the authority; but instructions direct the manner of transacting the authorized business and contemplate only a private rule of guidance to the agent and are independent and distinct in character." 2 C. J. S. Agency, § 94, p. 1200.

Thus, authority is coextensive with the business or duty intrusted to the servant, while instructions have to do only with the details or manner of performing the duty. The servant may violate his instructions

and still render his master liable, provided that the servant is engaged in what he was lawfully employed to do. But the servant cannot assume an authority which he does not have, and then in the wilful or wrongful exercise of such assumed authority render the master liable. The distinction is recognized in *Loux v. Harris,* 226 Mich. 315, 197 N. W. 494; and *Luckett v. Reighard,* 248 Pa. 24, 93 Atl. 773, Ann. Cas. 1916A, 662, both of which cases are relied on in the prevailing opinion.

The fallacy of the reasoning of the majority is, in my opinion, in assuming that, when Lynch left the fairgrounds, without the knowledge or consent of his superior, to go back to Elma and get Mrs. Ladley, who was related to him by marriage and who, he thought, might be a prospective customer, he was thereby engaged in something that was incidental to the acts which he was authorized or employed to perform and which would indirectly contribute to the furtherance of the master's business.

On this particular occasion, Lynch was employed only to drive the car to the fairgrounds and subsequently in the parade. He had no authority whatever to make trips for the solicitation of prospective customers or to deliver customers bodily to the appellants or one of their salesmen, or, much less, to invite them to ride in a parade which was for a demonstration to the general public only. His trip to Elma was in no sense incidental to the duties that he was authorized and required to perform. His duties required him to remain in the fairgrounds, not to leave them. Mrs. Ladley's presence in the parade was neither contemplated nor authorized by the appellants, and the act of Lynch in going after her disrupted entirely the purposes for which the cars were lent, as the results so disastrously proved.

This is a case where an employee, intrusted with the property of his employer to be used for a single purpose, in a definitely described way, has gone wholly outside of the scope of his employment, upon a mission that he was not authorized or expected to perform, without the knowledge or consent of his employer, and through his own negligence has injured others. In such a case, the employer should not, in my opinion, be held liable.

I therefore dissent.

TOLMAN and BEALS, JJ., concur with STEINERT, C. J.