[No. 26636. Department One. August 31, 1937.]

ELLIS FORSBERG et al., Respondents, v. DAVID R. TEVIS, Appellant.[1]

L. B. Donley, for appellant.

Hogan & Adams, for respondents.

BLAKE, J.—The plaintiff owned an automobile trailer, which, between two and three o'clock in the afternoon

[1] Reported in 71 P. (2d) 358.

of April 1, 1936, was parked on the north side of Cherry street, in Aberdeen. While Mrs. Forsberg was inside the trailer, a truck, driven by one Kullander, collided with it. The truck bore the inscription, "Tevis Laundry & Cleaners."

Alleging that the defendant, David R. Tevis, was the owner of the truck, and that Kullander was his servant, acting within the scope of employment, plaintiffs brought this action to recover for damage to the trailer, and on account of injuries sustained by Mrs. Forsberg.

The defendant denied ownership of the truck. He also denied that Kullander was acting within the scope of his employment. The cause was tried to a jury, which returned a verdict in favor of plaintiffs, both for personal injuries and property damage. From judgment on the verdict, defendant appeals.

That Kullander's negligence was the proximate cause of damages to respondents, is not questioned. The assignments of error raise three questions: (1) The sufficiency of the evidence to establish appellant's ownership of the truck; (2) the sufficiency of the evidence to show that Kullander was acting within the scope of his employment; (3) excessive verdict.

*First:* As has been noted, the truck bore the trade name, "Tevis Laundry & Cleaners." In addition, it clearly appears from the evidence that a laundry and cleaning business was conducted in Aberdeen under the name of "Tevis Laundry," and that the truck was, and had been for several months, used daily in the establishment's service. By decisive weight of authority, these facts are sufficient to make a *prima facie* case of ownership of the truck in the proprietor of "Tevis Laundry." Berry, Law of Automobiles (7th ed.), § 4,482; 15-16 Huddy, Cyc. of Automobile Law (9th ed.), § 160; *Hartig v. American Ice Co.,* 290

Pa. 21, 137 Atl. 867; *Sobolovitz v. Lubric Oil Co.*, 107 Ohio St. 204, 140 N. E. 634; *Weber v. Thompson-Belden & Co.*, 105 Neb. 606, 181 N. W. 649; *Buckley v. Sutton*, 231 Mass. 504, 121 N. E. 527; *Howell v. J. Mandelbaum & Sons*, 160 Iowa 119, 140 N. W. 397, Ann. Cas. 1915D 349, (Note) 353.

Appellant contends, however, that his ownership of the business (Tevis Laundry) is not sufficiently shown by the evidence to warrant submission of the issue to the jury. Brooks Murphy, who was Kullander's predecessor in operating the truck, testified that appellant hired him, and told him that he was the owner of the business. This testimony was not controverted. Appellant did not take the witness stand. His son, James Tevis, testified that he (James) was manager of "Tevis Laundry;" that his father was not the owner of the business, but that he (David) had "an interest" in it.

But, says appellant, this evidence is not sufficient to establish his ownership at the time of the collision; that, at most, it only tends to prove his ownership at a time some months prior. But, where it is shown that property belongs to a particular person, the law presumes that the ownership remains unchanged, in the absence of proof to the contrary. 22 C. J. 90, 126; *Collins v. Denny Clay Co.*, 41 Wash. 136, 82 Pac. 1012.

Clearly, under this evidence, the jury was warranted in holding appellant responsible, as owner of the truck, if Kullander was acting within the scope of his employment at the time of the collision.

*Second:* It appears that Kullander was hired by James Tevis February 1, 1936. He remained in the employ of "Tevis Laundry" until the day after the collision. His duties were to drive the truck, pick up and deliver laundry, and *solicit business.* He testified that his territory covered Aberdeen, Hoquiam, and

Cosmopolis. James Tevis testified that Kullander's territory did not extend to Hoquiam.

The collision occurred while Kullander, with two other young men in the truck, was on his way to Hoquiam. He testified that his purpose was to solicit business for "the company." He admitted that he and the other boys had been drinking, and that there had been talk about calling on some girls in Hoquiam. He was confronted with a statement signed by him the day after the collision, which recited: "I had no company business in Hoquiam." Nevertheless he insisted throughout his testimony that, whatever the purpose the other boys had in mind in going to Hoquiam, his own was to solicit business for "the company." The rule applicable under the evidence is stated in 1 Restatement of the Law of Agency, p. 530, as follows:

"The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service . . ."

This rule was in substance applied in the case of *McMullen v. Warren Motor Co.*, 174 Wash. 454, 25 P. (2d) 99. Applying it to the evidence in this case, we are satisfied that it was for the jury to say whether Kullander was acting within the scope of his employment.

█ *Third*: The jury awarded $3,500 on account of injuries sustained by Mrs. Forsberg. At the time of the collision, she was standing on a box, painting the inside of some cupboards. She was thrown so that the imprint of her feet appeared on the ceiling of the trailer. Radiographs did not show any broken bones, but that she sustained severe bruises of the soft tissues there can be no doubt—particularly to the left knee.

She was confined to her bed for a month and was on crutches for another month. At the time of the trial, the injured knee was still discolored, and a half inch larger than the other. It was described as a "loose joint"—the result of a "wrenched and pulled . . . ligament." "There was a grating in the knee joint underneath the patella—scraping when . . . moved . . . back and forth or up and down." Opinion was expressed by physicians that the condition was permanent—that there would always be "a residual weakness" in the joint.

While the verdict, to us, seems large, we do not feel that we can say that the amount in itself indicates it was the result of passion and prejudice. See *Blau v. Puget Sound etc. Co.,* 88 Wash. 260, 152 Pac. 1023; *Johnson v. Hunter,* 141 Wash. 190, 251 Pac. 123; *Johnston v. Elmore,* 141 Wash. 293, 251 Pac. 558. And we find nothing in the record that would tend to excite the jury to passion and prejudice. Under the facts, we feel that for us to disturb the verdict would simply amount to a substitution of our opinion in the stead of the jury's.

Judgment affirmed.

MILLARD, MAIN, and GERAGHTY, JJ., concur.

ROBINSON, J. (dissenting)—In spite of the weakness of the evidence offered to prove the ownership of the truck, I agree with the majority that it was sufficient to make a case for the jury, and I also agree with the majority that it is not within our province to disturb the verdict because it seems somewhat excessive. But I cannot concur in the holding that there was sufficient evidence to warrant the jury in finding that Kullander was acting within the scope of his authority, and I think that the judgment should be reversed and the cause dismissed.

In order to fully understand this rather unusual case, it is necessary to know that Kullander was himself a defendant in this matter, and that he remained a defendant until the plaintiffs voluntarily dismissed him just before the case was sent to the jury. He was called as a witness on behalf of the plaintiffs and testified for the plaintiffs only, and, in view of the fact that the plaintiffs were attempting to recover a verdict of $3,725 against him on allegations that he had damaged them to that extent by reckless and negligent driving, he must have seemed to the jury to be refreshingly frank and candid, as may be seen from the following account of the salient points of his testimony.

Kullander testified that he was employed by his co-defendant, on some date between February 1 and 7, 1936, to pick up and deliver bundles and solicit business. His hours were from eight-thirty to six, with one hour off at noon. On April 1, 1936, he went home at eleven a. m. and found there three of his friends amusing themselves with a deck of cards and a gallon of wine. He joined the party, but about noon went back to the laundry and secured a bundle which he delivered to an Aberdeen hotel. After getting lunch at a malted milk shop, he returned home. The three other young men who, for purposes of brevity, will be referred to by their Christian names, were still occupied with the wine. Kullander testified that he drank two glasses a little smaller than water glasses. Brooks, who was also called by the plaintiffs, testified that they were using ordinary water glasses, and that Kullander drank "a few."

At about two-thirty, Paul wanted to go to Hoquiam to see a girl. Brooks testified that Paul and Kullander were going over there to see some girls. At any rate, according to Kullander, they set out about two-thirty, that is, he, Paul, and Brooks. The fourth young man

was "sick," according to Brooks, and not "in shape" to go. Kullander testified he drove down Cherry street about as fast as the truck could go, about "fifty miles an hour." He drove so fast that the truck was "wobbling a little bit;" "that he turned around to speak to Brooks," who was in the back of the truck, and ran off the curve of the road into the trailer.

On April 2nd, the day after the accident, Kullander signed a statement concerning the matter. He denied that it was prepared by someone else, saying: "I dictated it to them." The statement was as follows:

"I went to work for Tevis Laundry and Cleaners Company about February 7, and worked for that company up until April 1 at which ·time I had an automobile accident.

"At noon on April 1, I had lunch at home. About one o'clock I went out with the company car, drove around town a little, came back to the house probably about 1:30 or 1:40, stayed in the house with Brooks Murphy, Paul Evelith and Stan Remelmeyer. About 2:00 Brooks, Paul and I decided to go for a ride and we decided that we would go to Hoquiam where we were going to call on some girls. *I had no company business in Hoquiam and figured that I would have nothing to do in the line of company business until about 3:30* and then I would have to come back to Aberdeen to take care of that work which would consist of picking up a bundle at an Aberdeen address.

"We were driving in a westerly direction along Cherry street, which is a dirt gravel road about twenty-four feet wide with about eighteen feet driving surface. Paul Evelith was sitting in the front of the car with me and Brooks was sitting in the rear. We were traveling about 45 miles per hour when I turned around to talk to Brooks and as I did so I guess the car swerved to the right and before I could get turned around again to look down the road or try to straighten up the car we had driven off the road and crashed into the rear end of the Forsberg automobile trailer. I was knocked out of the car by the impact. I was badly

dazed and some passer-by picked me up and took me to the St. Joseph's Hospital.

"I made a police report today, April 2, about 11:00 A. M. The cause of the accident was driving a little too fast and the fact that I turned around to talk to Brooks, and before I knew it the car was off the road. About 12:00 noon we had had some wine at my house, but I had only had two small wine glasses and I know that *this did not affect my driving in any way and that I was absolutely sober at the time the accident happened*." (Italics mine.)

It will be noted that Kullander's evidence given at the trial was even more certain to insure the plaintiffs' recovery against him than the statement made on April 2nd, which is quoted above; but he went on to introduce a new element into the case. He testified that, when he started to take Paul to Hoquiam to see his girl friend, he had something else in mind. He was going to see if he could not get the young lady's laundry trade, and he was going to see another girl who worked at a lunch counter over there for the same purpose. He said he had solicited her laundry "three or four months before that." On cross-examination, he remembered he had been to see another Hoquiam girl about her cleaning business "two or three months before." While the credibility of a witness is ordinarily not for the court, we must have the right to note at least that this evidence cannot be wholly and completely true, since it is undisputed that the witness had worked for the laundry slightly less than two months.

In speaking of Kullander's evidence, it is said in the majority opinion: "He testified that his territory covered Aberdeen, Hoquiam, and Cosmopolis." That is true, literally speaking, and being true, when taken with the other matters above referred to, unsubstantial as they are, it would seem to be sufficient to take the

question to the jury as to whether or not Kullander was acting within the scope of his authority in taking the truck to Hoquiam. But upon a careful reading of his testimony, as it is found in the statement of facts, it appears that the sentence quoted from the majority opinion depends altogether on the following question and answer:

"Q. When you were an employee there did anybody tell you what your territory would be? A. No. There was no limit. About any place in Aberdeen, Hoquiam, and Cosmopolis."

It seems to me that the most that can justly be made out of that answer is this: No one told me what my territory would be. It was not limited. I assume that it included Aberdeen, Hoquiam, and Cosmopolis. The only statement of fact in that answer is that no one told him what his territory would be. The rest of the answer is merely an agent's personal interpretation of the scope of his authority expressed in the form of a conclusion.

It was not necessary, of course, for the plaintiffs to show that the appellant expressly authorized Kullander to use the truck to solicit laundry in Hoquiam. If there was any evidence at all that Kullander had previously done so, with appellant's knowledge or consent, that, I think, would be amply sufficient to warrant an inference that he was so authorized. But there is no evidence that Kullander ever drove the truck to Hoquiam before; that he ever picked up a bundle of laundry there, or delivered one there with the truck or otherwise, or that he ever used the truck in soliciting in Hoquiam, or, giving full credit to his evidence, that, if he did make one or two solicitations there, the appellant ever knew of it. There is not even any evidence that appellant had any customers in Hoquiam, or that he desired any there, and no fact of

any kind which would entitle Kullander to believe or assume that he did.

So, if the principle that the credibility of witnesses is exclusively for the jury requires us, as judges, in passing upon the sufficiency of evidence to sustain a verdict for the plaintiff, to treat everything testified to on behalf of the plaintiff as true, even when as fanciful and inherently incredible as in this case, and we are required to accept it as a fact that Kullander left the drinking party and got into the truck and started to Hoquiam to solicit laundry, still that does not prove that he was acting within the scope of his authority. Indeed, looking at the evidence in the case as a whole, it tends to prove that he was going beyond the scope of his authority. The manager of the laundry testified that Kullander's duties were to regularly drive the delivery truck to pick up laundry and dry cleaning, and to solicit laundry in the contiguous territory of Aberdeen, South Aberdeen, and Cosmopolis. The manager spoke of Kullander as driving "a route," and stated that he had no business in Hoquiam whatever.

No witness was called by respondents to dispute this testimony. It was not impeached in any way, nor did respondents attempt to weaken it on cross-examination, but left it severely alone, and it stood wholly undisputed at the end of the case. If there is any evidence at all in the record that Kullander was authorized to use the truck, to collect, deliver, or solicit laundry in Hoquiam, or evidence of any fact which might warrant an inference that he had such authority, I have not been able to find it.

I have no quarrel with the legal authorities cited by the majority on this branch of the case. They relate only to a phase of the subject which is more or less a side issue. In the briefs and oral argument, the respondents relied particularly upon the case of *Pound-*

*stone v. Whitney,* 189 Wash. 494, 65 P. (2d) 1261, a decision by a divided court, announced on April 7th of this year, the soundness of which has been vigorously and widely questioned. In view of the fact that respondents relied so strongly upon that decision, I think it only just to say that I feel compelled to concede that it fully supports the position taken by them in this case. Since, however, the majority do not cite the *Poundstone* decision or rely upon it as authority, I am not required to meet it in this dissent, nor to specifically express the reasons for my dissatisfaction with the rule therein laid down.

The judgment appealed from should be reversed and the cause dismissed.