[No. 29003. Department One. July 17, 1943.]

WINIFRED M. LEARY, *Appellant*, v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Respondent*.[1]

*Kenneth Durham,* for appellant.

*The Attorney General* and *Harry L. Parr, Assistant,*
for respondent.

JEFFERS, J.—This is an appeal by Winifred M. Leary,
widow of Frank C. Leary, from a judgment of the superior court for King county, affirming an order of the
joint board of the department of labor and industries,
on rehearing, sustaining the supervisor's rejection of
Mrs. Leary's claim for a widow's pension.

[1]Reported in 140 P. (2d) 292.

Frank Leary died on November 23, 1941, while in the employ of Associated Shipbuilders. Following his death, his widow, Winifred Leary, who will hereinafter be referred to as appellant, filed with the supervisor her claim for a pension. On January 17, 1942, the supervisor rejected her claim, for the following reasons, as shown by his order:

"Whereas, Frank Leary died on November 23, 1941, while in the employ of the Associated Shipbuilders, the cause of death being coronary occlusion and a claim has been filed by Winifred Mary Leary, widow of Frank Leary, alleging that the fatal heart attack was induced by excitement, and

"Whereas, the heart attack and death occurred outside of the premises of the employer's plant and while the deceased was engaged in assisting a fellow employee, who had gone off shift, to start his car and while so engaged was not in the actual performance of his duties for the employer, and

"Whereas, there is no evidence whatsoever of any injury, strain or other untoward event in the course of employment which could have been responsible for his collapse,

"Therefore, it is ordered that the widow's claim be and the same is hereby rejected for the reason that death was not the result of an injury in the course of employment but was due solely to a progressive coronary disease and his employment was in no way responsible for the fatal culmination of the disease."

We have set out the above order because of the contention made by the department (to which we shall later refer) relative to the issues raised by this appeal.

Appellant timely filed her application for a rehearing before the joint board. This application was granted, and on April 14, 1942, the matter came on for hearing. The following named witnesses testified on behalf of appellant: T. F. Dunn, C. A. Sullivan, Dr. Henry Takacs, and appellant. The department offered no testimony.

The following facts, as shown by the evidence, are undisputed: At the time of his death, Frank Leary

was employed as a gateman for Associated Shipbuilders, and had been in such employment since March 1, 1941, working on what is known as the swing shift. Mr. Leary went on duty at four p. m., relieving a Mr. Dunn, who was also a gateman. Mr. Dunn testified as follows relative to the duties of the gateman:

"Q. What was his [Mr. Leary's] job at that time? A. Well he was, he was gate man on the swing shift. That is he went to work at four o'clock and relieved me. Q. Now the gatemen's duties are what? A. Well their duties are to open the gate to admit traffic and also to check all people coming in for passes and their right to be in the yard. Q. In case a person parks near to the yard is it your duty to go outside and check up on them? A. Yes. Q. You have to look out for people then who are both inside and outside the yard? A. Yes. Q. Now on this—or, is it or is it not your duty to see that the gate is kept free and cleared at all times from any obstruction nearby which might interfere with fire apparatus? A. Yes, absolutely."

There was no cross-examination of Mr. Dunn.

Mr. Sullivan, who was in the employ of Associated Shipbuilders as a watchman, or guard, testified as follows relative to the duties of the gateman:

"Q. What are the duties of the gate keeper at that gate? A. To check all incoming and outgoing traffic; both vehicle and pedestrian. . . . Q. Are they commissioned as police officers? A. Deputy sheriffs. Q. Deputy sheriffs. Well do they have anything to do with the parking there and the conditions immediately around the gate on the outside? A. Yes sir. The driveway or approach to the gate is supposed to be kept clear at all times. The reason for that being in case of fire so the department will have easy ingress to the plant. That is the main reason. Q. And it is their duty to observe anything that is outside that gate that might affect the safety of the plant I suppose? A. Oh, absolutely. Keep that entrance clear."

The testimony quoted is all the evidence relative to the duties of Mr. Leary as gatekeeper.

We shall next set out the testimony relative to the gates. Mr. Dunn testified as follows:

"Q. Then the main gate to the shipyards consists of how many parts?  A. Well, there are two gates.  . . . Q. About what size are each of those gates? A. Oh, I would say they are about six or six and a half feet high and, well, each one is probably about twelve, at least twelve feet wide.  Q. And they swing together in the middle?  A. Yes.  Q. How are those gates fastened?  A. Well on the end they swing from they are fastened by hinges and they have, in the center there is a rod that raises up; you have to raise that up to open the gates.  In other words there is a little hole in the concrete there (Indicating).  Q. Yes?  A. (Continuing) With a square metal frame around it.  Q. The hole is a, sort of on a, a hump or a raised place? A. Yes, and the rod, in order to raise the gates you see when you shut the gates—oh, I don't know, maybe I could best do it by drawing a picture of it rather than explaining it.  MR. JACKSON:  Well it's just like the, you have flanges facing, the rod dropping into the socket, in other words like closing the doors on a garage, isn't it?  A. (Continuing) No, the rod runs the full height of the gate and there is a handle on it that you have to raise, turn it— MR. JACKSON:  That is in opening it.  A. (Continuing) Yes, and then there is, oh, a small strap that fits in another part of the gate and drops down and then there is a hole in that you can put your padlock on.  And, well in order to raise the gate you have to raise your handle and turn that so it will not slide down in again.  Q. How much does this handle weigh you have to lift to open the gate; how much does that weigh?  A. Oh, I don't have any idea of the weight of it.  It takes a pretty good pull to open it though.  You see, it's exposed to the weather and gets bumped and as a result of that it's sometimes a little hard to open."

Mr. Sullivan described the gate as being in two sections, having a total width of about eighteen feet, and stated that the bar or rod referred to weighs about twenty-five or thirty pounds.

We desire at this time to set out the statement of questions involved, as made by appellant in her brief:

"1. Where it was the duty of appellant's husband as a guard at the entrance gate of a shipyard to keep the gate clear of obstructions at all times and no means for carrying out this duty were specified or provided by the employer, was he in the course of employment while attempting to use his automobile as a source of power to push and start the disabled car of a fellow workman, which was stalled in front of the gate in such position as to obstruct entrance to the shipyard?"

"2. Was the death of appellant's husband from sudden heart failure while so doing due solely to a progressive heart disease uninfluenced by exertion?"

We shall now set out quite fully the testimony relative to Mr. Leary's acts referred to in question No. 1, as it is apparent that, if deceased was not in the course of his employment at the time of his death, it becomes immaterial whether or not such acts caused his death.

Mr. Dunn testified that Mr. Leary reported for work on the day of his death at about a quarter to four, and that he (Dunn) unlocked the gate and let Leary in; that, shortly after four, Leary opened the gate for Dunn, who went out to his car, which was parked outside the gate on the south side of Sixteenth avenue southwest, and about twelve or fifteen feet south of the gate; that Leary's car was parked a little north of the gate, on the gravel. Mr. Dunn further testified that when he got to his car he found it would not start, the battery being down; that there was a slight incline where the car was parked, so he shoved his car, got it rolling back, and then jumped in and threw it in reverse to try to start it, but the car would not start; that the car had rolled back so it was in front of the south gate, which was opened and closed all the time. When the witness found his car in that position, he called to Leary and asked him if he would come give the car a push so he could get it started.

The witness, upon being asked whether or not his car was then in such a position that it would have blocked access to the yard by fire apparatus, answered:

"A. Why, yes. Nobody could have got in—well, they could have gotten in but it would have been an awful tough job to do it. They would have had to swing clear around where my car was in my position and go up to the other gate; that would have necessitated opening the north gate. A. And anybody would have had to swing clear around you? A. Yes, my car was in the middle of the street. . . . Q. Then what did Mr. Leary do? A. Why he came out. He asked Mr. Sullivan to watch the gate and— . . . Q. That is Mr. C. A. Sullivan? A. Yes. And he said he wanted to go out and push my car with his so he could get it started and get it out of there. And he then unlocked the gate and opened it and he went over and got in his car. Q. And who was Mr. C. A. Sullivan; what was his job there? A. He is the clock patrol at the yard. Q. And then just describe what happened? A. Well when Mr. Leary came out and got in his car I went over and got in my car and I was watching him through the rear view mirror; he got in his car and started it up and worked it around and pulled it out in the middle of the street and of course I was watching through the rear view mirror to see when he was going to make contact with my rear bumper with his front bumper and then I noticed he was pulled out in the middle of the street and stopped about, oh, about four feet back of my car I would say and I was wondering why he didn't pull up and make contact and give me a push and I saw him get out of the car and he called to Mr. Sullivan and Mr. Sullivan. . . . Q. Well you heard him call to Mr. Sullivan? A. Well no, I couldn't hear him but I saw him motion through the rear view mirror and then so Mr. Leary gets out of his car and Mr. Sullivan got in and Leary started back over toward the gate and at that time Mr. Sullivan made contact with my rear bumper and pushed my car; he only had to push it a short distance and it started right off and I just kept right on going then. . . . Q. And you didn't see what happened subsequently? A. No, I didn't."

Mr. Sullivan testified that his work took him all over the plant, and one of his stations was at the gate; that his shift on Sunday, November 23, 1941, was the same as Mr. Leary's. He further testified that, on this Sunday afternoon, Mr. Dunn prepared to leave shortly

after he (Sullivan) came to work; that Mr. Leary called to him and said, "You watch the gate, I want to get my car and give Mr. Dunn a shove"; that the witness came right away, and saw Mr. Dunn's car, which at that time was in the middle of the street, headed south; that it was necessary for Mr. Leary to call him, as the gate must either be attended or locked at all times; that, as the witness came out of the office building door, Mr. Leary had just climbed into his car; that the street had been freshly graveled where the Leary car was parked, and the road scraper was still working there.

. It further appears from the testimony of this witness that Leary backed his car out and got lined up in back of the Dunn car; that, as Leary got his car lined up, he signaled to the witness, who walked over to the car and Leary said, "You take the wheel, Sully," and the witness got in back of the wheel; that Leary got out of the car, and the witness noticed his hand was up to his diaphragm and he walked over toward the gate; that Sullivan started the car and gave Dunn a push and got his car started; that, when Sullivan looked back, Leary was standing by the gate; that Sullivan backed the car up almost in front of the gate, and when he looked again he saw Leary reel and fall. It appears that Mr. Leary was never conscious after Sullivan got to him, and he died before they could get a doctor.

While, because of the conclusion we have reached, it is not material, it may be stated that no one noticed anything unusual in Leary's appearance prior to the above incident. Mr. Dunn had some conversation with him, during which Mr. Leary made some joking remark. It may also be noted that Leary had for some years been affected with a serious heart ailment, and, until he came on this job, had not worked since 1936. He had consulted at least two doctors, and had been advised he should not work, and that any exertion

might cause his death. There was testimony that it would take some effort to back and turn the Leary car and get it in position behind the Dunn car. Mrs. Leary testified that her husband had trouble backing out from an ordinary parking position.

Dr. Takacs, the only physician to testify, and who had attended Mr. Leary and knew his heart condition, after having propounded to him a hypothetical question containing the facts hereinbefore related, testified that in his opinion the exertion of backing and moving his car brought on the attack from which Mr. Leary died.

The joint board, after hearing the testimony, was of the opinion that Leary, in assisting Dunn to move his car, was not in the course of his employment, and that the fatal heart attack was not brought on from any exertion on Leary's part, in the course of his employment. An order was entered sustaining the action of the supervisor. Mrs. Leary appealed to the superior court for King county, where, upon the record as made before the joint board, the trial court affirmed the action of the joint board, and this appeal followed.

Appellant assigns error on the entry of finding of fact No. 2, which was to the effect that deceased, when using his own private car to push Mr. Dunn's car to get it started, was not in the course of his employment, as deceased was employed as a watchman in a personal capacity, and not, with a private car, to remove obstructions from the approach to the gateway, and that under Mr. Leary's contract of employment he was not required to furnish any tools or equipment to remove any obstructions from the gate. Appellant also bases error on the entry of finding of fact No. 3, which is to the effect that the department rejected appellant's claim for the reason that death was not the result of an injury in the course of employment, but was due solely to a progressive coronary disease, and deceased's employment was in no way responsible for his death.

Appellant also claims the court erred in entering finding of fact No. 6 and conclusion of law No. 1, in which the court found that the department correctly found the facts and construed the law.

From the statement of questions which appellant claims are presented in this case, which have hereinbefore been set out, and from her argument, it is evident that no claim is made that any exertion on the part of Mr. Leary, other than that required in backing his car from where it was parked and getting it in position behind the Dunn car, brought on the heart attack which caused his death. It is equally evident that the supervisor, the joint board, and the trial court, having concluded that Mr. Leary, in using his car to push the Dunn car, was not in the course of his employment, had no occasion to, nor does the record show that they did, determine whether or not such exertion brought on the attack. What the joint board held in regard to this matter was that nothing in connection with Leary's employment brought on the attack. Having concluded that he was not in the course of his employment at the time he used his car to push the Dunn car, it would be immaterial what happened to Leary while so engaged, in so far as appellant's claim is concerned. Inasmuch as this question was not decided by the joint board, it could not have been and was not before the trial court, and is not before us.

We call attention to the case of *DeStoop v. Department of Labor & Industries*, 1 Wn. (2d) 340, 95 P. (2d) 1026, wherein we quoted from the case of *Cole v. Department of Labor & Industries*, 137 Wash. 538, 243 Pac. 7, as follows:

" 'This language [referring to Rem. Rev. Stat., § 7697], it seems to us, clearly shows a legislative intent that the superior court shall not have any original jurisdiction in the administration of the law, or decide any question to be decided in the first instance by the department. It seems to us, the lawful inquiry, upon review in the superior court, is only with reference to a question

or questions which have been actually decided by the department. When the department decided that Cole was not injured as the result of a fortuitous event, and that, therefore, he had no right whatever to compensation, it manifestly made no decision on the question of proper classification or degree of any injuries suffered by him. Indeed, the department then had no occasion to decide any such questions. For the superior court to entertain those questions and determine the amount of compensation, as it did in this case, was to assume original jurisdiction over a subject within the exclusive original jurisdiction of the department. It seems to us, that to allow the superior courts to render judgments going to the extent of the one here in question would be to allow them to exercise original jurisdiction in the administering of the law, in every case wherein the department should decide that the claimant was not injured as the result of a fortuitous event, and the superior court, upon review, should decide otherwise. This, we feel quite sure, would be going clearly beyond both the letter and spirit of the law.' "

Also, in the case of *Harrington v. Department of Labor & Industries,* 9 Wn. (2d) 1, 113 P. (2d) 518, we held that lawful inquiry, upon review in the superior court, is only with reference to a question or questions which have been actually decided by the department, citing the case of *Cole v. Department of Labor & Industries, supra.*

The only question before this court, then, is whether or not Mr. Leary, in going out and getting his car for the purpose of pushing the Dunn car away from the gate, was, while so doing, in the course of his employment. The facts in the case being undisputed, the only question is whether or not the law was properly applied to the facts.

The acts of deceased occurred during his hours of employment. The Dunn car practically blocked the entrance to the south gate. It was part of Mr. Leary's duties to see that the entrance to the gate was kept clear at all times. In using his car to push the

Dunn car away from the entrance to the gate, Leary was undoubtedly rendering a service to Dunn, but he was also in the performance of his duty.

"The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service, . . . " Restatement of the Law of Agency, pp. 530-531.

The above statement of the rule has been quoted with approval in *Forsberg v. Tevis*, 191 Wash. 355, 71 P. (2d) 358, and *Carmin v. Port of Seattle*, 10 Wn. (2d) 139, 116 P. (2d) 338. It is true the foregoing cases were automobile damage cases, but we see no reason why the general rule as announced and applied should not be applicable here.

We also find in the text last above referred to, at p. 539, the following statement:

"If the master directs a servant to accomplish the result and does not specify the means to be used, the servant is authorized to employ any usual or suitable means."

We are clearly of the opinion that, under the rule applied to the facts in the case of *Church v. Department of Labor & Industries*, 179 Wash. 443, 38 P. (2d) 234, Mr. Leary was in the course of his employment in using his car in an attempt to remove the Dunn car so that it would not block the entrance to the gate. In the cited case, Mr. Church was, by his employer, furnished with tools to do the required work, but stated that he had a better clamp at home than the one furnished, and, at the time of the accident which caused his death, was on his way home to get the clamp. We held he was in the course of his employment.

In the instant case, the trial court seemed to give some weight to the fact that the joint board must have concluded there was no emergency shown which re-

quired the immediate removal of the Dunn car. This question of "emergency" was also considered in the *Church* case, *supra,* for we therein stated:

"It appears that the emergency which rendered necessary the use of a new clamp was not acute, and that the condition which rendered repair of the machinery advisable had not arisen suddenly."

We are of the opinion the following cases support our conclusion that deceased was in the course of his employment, even though no equipment had been furnished him, and in using his car he was acting on his own initiative in an endeavor to perform an act of benefit to his employer. *Burchfield v. Department of Labor & Industries,* 165 Wash. 106, 4 P. (2d) 858; *Hobson v. Department of Labor & Industries,* 176 Wash. 23, 27 P. (2d) 1091; *Morris v. Department of Labor & Industries,* 179 Wash. 423, 38 P. (2d) 395; *McKay v. Department of Labor & Industries,* 181 Wash. 702, 44 P. (2d) 793.

For the reasons herein assigned, the judgment of the trial court is reversed, with instructions to remand the case to the department for further proceedings not inconsistent with this opinion.

SIMPSON, C. J., MILLARD, STEINERT, and MALLERY, JJ., concur.