

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

May 17, 1957

Honorable A. C. Spencer
Executive Director
Texas State Soil Conservation Board
Temple, Texas

Opinion No. WW-97

Re: Is the State Board of Water
Engineers, under the State laws
required to approve watershed
plans and the design and speci-
fications for individual structures
in the plan?

Dear Mr. Spencer:

With respect to your letter dated March 20, 1957, which we
quote in part as follows:

"1. If a Water Control and Improvement District
organized under Texas Law is co-sponsor and contracting
agency, for a Watershed Protection and Flood Prevention
Project as authorized under Public Law 566, Acts of the
83rd Congress, as amended under Public Law 1018, Acts
of the 84th Congress, and

"a. Cost of easements and rights-of-way, con-
tract administration and operations and maintenance
is financed by bonds issued by the district, or

"b. Above costs are financed by contributions
to the district by individuals, groups, municipalities
or counties, or

"c. Cost of easements and rights-of-way and
contract administration are donated to the district
and (1) bonds are issued, or (2) annual tax revenue
is used to finance operation and maintenance costs,

is the State Board of Water Engineers, under State Laws
required to approve watershed plans and the design and
specifications for individual structures in the plan?

"2. If a county serves as co-sponsor and contracting agency and

"a. The county general funds are used to pay costs of easements and rights-of-way, contract administration and operations and maintenance, or

"b. Special ad valorem tax funds are used for above costs, or

"c. All easements and rights-of-way are donated, with the county paying costs of contract administration and operation and maintenance,

is the State Board of Water Engineers, under State Laws required to approve watershed plans and the design and specifications for individual structures in the plan?

"3. If a soil conservation district is sponsor and contracting agency and

"a. All costs of easements and rights-of-way are donated, and contract administration and operations and maintenance are financed out of district funds (no taxes or bonds), or

"b. All of above costs are donated to the district,

is the State Board of Water Engineers, under State Laws required to approve watershed plans and the design and specifications for individual structures in the plan?

"Public Law 566 as amended by Public Law 1018 permits the addition of water storage space to flood prevention structures, provided, however, that no structures shall store more than 25,000 acre-feet and provided that in such cases the Federal Government will pay the full cost of the structure allotted for flood prevention with a municipality, individual or group paying the additional cost (including engineering services) of water conservation capacity. The water user would secure necessary water storage rights through the State Board of Water Engineers.

"The above being true:

"4. What effect would the addition of municipal or irrigation water storage capacity to a flood water retarding structure have on the question of State Board of Water Engineers' approval of the over all watershed plan and design of individual structures?

"5. Is the State Board of Water Engineers required by law to approve the plan and design of a drainage project planned and constructed by (1) a water control and improvement district, (2) soil conservation district, or (3) county, with the technical and financial assistance of the Soil Conservation Service furnished under Public Law 566, as amended, when the subdivision of State Government furnishes the easements and rights-of-way, contract administration, a part of construction costs and operates and maintains the project?",

we tender the following opinion:

The basic inquiry pertaining to the questions quoted above is -- what are the duties of the Board of Water Engineers, as conferred by the Constitution of Texas and Texas Statutes, relative to the types of structures comprehended by Public Laws 566 and 1018*?

The title and enacting clause of Public Law 566, as amended, supra, is quoted as follows:

## "AN ACT

"To authorize the Secretary of Agriculture to cooperate with states and local agencies in the planning and carrying out of works of improvement for soil conservation, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That erosion, flood water, and sediment damages in the watersheds of the rivers and streams of the United States, causing loss of life and damage to property, constitute a menace to the national welfare; and that it is the sense of Congress that the Federal Government should

cooperate with states and their political subdivisions, soil or water conservation districts, flood prevention or control districts, and other local public agencies for the purpose of preventing such damages and of furthering the conservation, development, utilization, and disposal of water and thereby of preserving and protecting the Nation's land and water resources." (Emphasis supplied)

Article 7472e, V.C.S., places certain duties upon the Board of Water Engineers with respect to federal projects affecting public waters in Texas. This article provides that the Board shall hold hearings in the same manner as in the case of hearings held on applications for permits to appropriate State waters. In determining the feasibility of the federal project, the Board is required by statute to consider the following: (a) Effect of such federal project on water users on the stream; (b) the public interest to be served; (c) development of dam sites to the optimum potention for water conservation; (d) integration of such federal project with other water conservation activities; (e) protection of the State's interest in the Texas water resources; (f) engineering practicality of the federal project, including cost of construction and maintenance.

The provisions of Article 7472e are cumulative of other statutes relating to public waters in Texas and provides a particular type of hearing before the Board of Water Engineers for federal projects affecting such public waters. It does not repeal or modify other statutes placing mandatory duties upon the Board of Water Engineers. While it is clear that under Subdivision 6 of the Act the specific type of hearing provided in Article 7472e is not required of projects developed in cooperation with the Secretary of Agriculture under the watershed protection and flood prevention acts, the subdivision clearly provides no exemption of any federal project from the Board's jurisdiction conferred by other statutes. Therefore, an examination of these statutes is necessary to a determination of your questions.

## BOND ISSUES

Except in cases where preliminary bonds are authorized, (Article 7880-31, V.C.S.), before bonds are issued, the Board of Water Engineers has a statutory duty of passing upon plans by (a) water improvement districts (Article 7799, V.C.S.); (b) water control and improvement districts (Article 7880-139); and (c) fresh water supply districts (Articles 7936 and 7799). These statutes place a definite responsibility upon the Board to make a thorough

investigation of proposed improvements before approving bonds. This is true whether the bond proceeds are used only for purchase of right-of-way or flood easements, or for such purposes as well as for payment for the structures involved. See Hopkins County Levee Improvement District No. 1, et al., v. Smith, et al., 266 S.W. 800, error ref. Therefore, except for proper expenditures of preliminary bond funds, in each situation described in your questions involving the issuance of bonds by such water districts, compliance with statutes requiring Board approval of plans is required.

Counties are given statutory authority to issue bonds for the creation of drainage districts. Article 8097, et seq., V.C.S., and the Attorney General is required to approve these bonds. Articles 8132, 8136a, V.C.S. However, there is no statutory requirement that the Board of Water Engineers approve plans of such districts.

## APPROPRIATIONS OF WATER

Article 7492, V.C.S., provides:

"Every person, association of persons, public or private corporation, political subdivision of the State, agency of the State or of the United States, who shall, after this Act shall take effect, desire to acquire the right to appropriate, for the purposes stated in this chapter unappropriated waters of the State, shall, before commencing the construction, enlargement or extension of any dam, lake, reservoir or other storage work, or any ditch, canal, intake, head gate, pumping plant or other distributing works, or performing any work in connection with the storage, taking or diversion of water, make an application in writing to the Board for a permit to make such appropriation, storage or diversion."

Article 7500a, V.C.S., provides:

"Anyone may construct on his own property a dam or reservoir to impound or contain not to exceed two hundred (200) acre-feet of water for domestic and livestock purposes without the necessity of securing a permit therefor."

Under these statutes a permit from the Board of Water Engineers is required before commencing construction of any structure to be utilized in the appropriation of public waters for any of the beneficial uses outlined in

Article 7470, V.C.S., except for 200 acre-feet reservoirs for livestock and domestic purposes constructed on private property. Therefore, a determination of whether the structures contemplated by Public Laws 566 and 1018 effect an appropriation of water is required.

Even though these structures are designed to utilize water under circumstances which would constitute an appropriation of water within the meaning of the Texas statute, no appropriative permit is required unless the structure is located on a "watercourse" as that term is defined by the courts. Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221 (1936); Hoefs v. Short, 273 S.W. 785, Tex.Civ.App. (1925). The Supreme Court of Texas in the Hoefs v. Short case defined a watercourse as follows:

"When it is said that a stream in order to be a natural watercourse to which water rights attach must have bed, banks, a current of water, and a permanent source of water supply, we have only described in detail such physiographic and meteorological characteristics as make the use of the stream for irrigation practicable. When it is once shown that the waters of a stream are so confined and persistent in their course, and flow with such frequency and volume that it is both practicable and valuable to irrigate therefrom, it is a stream to which water rights attach."

As to the meaning of "source of supply", the Court stated:

"All authorities agree that a current of water is necessary, yet the flow of water need not be continuous, and the stream may be dry for long periods of time."

Generally, if the structure is not located on a watercourse, and only diffused surface waters are involved, no appropriative permit is required to beneficially utilize diffused surface waters. Turner v. Big Lake Oil Co., supra. For a detailed discussion of the holding in the Turner case, see Rights in Diffuse Surface Waters in Texas, Proceedings, Water Law Conference, June 17-18, 1955, University of Texas Law School.

As to structures to be located on "watercourses", the necessity of an appropriative permit depends on a number of circumstances which must be determined under the facts of each case. If the structures to be constructed under Public Laws 566 and 1018 store water, under conditions other than those exempted by Article 7500a, we are of the opinion that appropriative permits

are required since the storage of water constitutes an "appropriation". We quote Hutchins, Selected Problems in the Law of Water Rights in the West, Misc. Pub. 418, U.S.D.A., at P. 324:

> "The storage of water is a means of making spring flood flows available for late season use, when the direct flow of streams is usually low, and of carrying water over from years of abundant precipitation to supply the deficiencies of subsequent drought seasons. It is a means of conservation of water as well as a feature of flood protection; hence appropriations may be made for storage as well as for direct use of water. The storage is of course a means to an end--the application of water to beneficial use, such as the irrigation of land, or the passing of water through a plant for the generation of electrical energy."

The Supreme Court of California has held that the storage of water for "flood control, equalization and stabilization of flow and future use" is among the beneficial uses of water for which an appropriation may and must be made. Meridian v. San Francisco, 13 Cal.2d 424, 90 Pac.2d 537 (1939). Accord: Moore v. California-Oregon Power Co., 140 Pac.2d 298, 802, 22 Cal.2d 725 (1943); U. S. v. Big Bend Transit Co., D. C. Wash., 42 Fed.Supp. 459, 468.

From our correspondence with you under the dates of April 16 and 19, 1957, we understand that the structures contemplated by Public Laws 566 and 1018 are primarily flood water retarding structures rather than storage structures being incapable of storing more than 200 acre-feet of water without modification, and that no use is made of the water retarded, such water being automatically released as rapidly as the stream channel will carry it without flooding.

According to Hutchins, Selected Problems in the Law of Water Rights in the West, supra, such flood water retarding structures do not involve a use of water ordinarily contemplated by appropriation statutes. We quote, at page 415, the following:

> "Their purpose is to regulate flood flows, not to store water for later use; and while they necessarily withhold water, the detention is for brief periods. This is a beneficial purpose in the interest of land conservation and flood protection, but is not such a use of water as is ordinarily contemplated by the appropriation statutes. The purpose of the structure is to benefit the public, and not to acquire an exclusive right to the flow

of a specific quantity of water for the sole use of an individual appropriator or group of appropriators. In this case, the water is not wanted at all."

An examination of Article 7470 indicates no legislative intent that the retardation of flood flows without any storage or beneficial use for the purposes stated therein is included within the purposes for which an appropriative permit may and must be obtained.

We therefore conclude that the flood retarding feature of the structures contemplated under Public Laws 566 and 1018 does not constitute an appropriation within the meaning of the Texas statute and that no appropriative permit is required for this purpose alone.

Our holding that an appropriative permit is not required for the construction of flood retarding structures by the political subdivisions of the State mentioned in your letter is not to be interpreted as a holding that no authority from the State is necessary to obstruct the flow of a public watercourse when no appropriation is effected. The public right and duty to conserve and develop public waters vested in the State by the Texas Constitution, Article XVI, Section 59a, and the State's ownership of such waters, Article 7467, V.C.S., may well require that permission to obstruct a watercourse be obtained from the State even when title to the bed of the watercourse is not in the State. In this opinion we have assumed that the statutory authority under which each of the political subdivisions mentioned in your letter operates includes the authority to obstruct public watercourses for flood control purposes.

However, these structures not only retard flood flows but are designed to provide up to 200 acre-feet of water storage in the sedimentary pool. We are advised that when the structures are built, the use of the sedimentary pool for livestock and domestic purposes by the landowners as well as use for silt storage is contemplated. From what has been said above it is apparent that under these circumstances an appropriative permit is required unless the water storage provided is excepted by Article 7500a, V.C.S., permitting the construction on one's own property of a dam or reservoir with capacity up to 200 acre-feet for livestock and domestic purposes without an appropriative permit.

The only question concerning the application of this exemption to the circumstances outlined in your letter relates to the requirement that the dam or reservoir be located on one's "own" property. This requirement of ownership of the land by the owner of the structure necessarily prohibits the location of structures which would otherwise be within the 7500a exemption across streams where the State of Texas has title to the bed of the stream.

The beds of all navigable streams, including those made navigable by virtue of Article 5302, V.C.S., are the property of the State. State of Texas v. Bradford, 121 Tex. 515, 50 S.W.2d 1065; Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441. Whether the State owns the bed of the stream at a particular location under Article 5302 is determined by whether the stream or tributary in question has an average width from cutbank to cutbank of thirty feet from its mouth to the location in question. Motl v. Boyd, 116 Tex. 82, 286 S.W. 458; Diversion Lake Club v. Heath, supra; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728; State v. Bradford, supra.

Article 5414a, V.C.S., commonly known as the Small Act, validated certain patents on lands lying across or partly across watercourses or navigable streams by granting and relinquishing certain limited rights to previous patentees of such lands. Section 2 of this Act reads in part: ". . . provided that nothing in this Act contained shall impair the rights of the general public and the State in the waters of streams or the rights of riparian and appropriation owners in the waters of such streams, . . ." The Supreme Court of Texas in State v. Bradford, supra, construes the above quoted reservation to the State and public of the waters of the streams involved in the Small Act as including "all things necessary to the practicable and substantial use of and enjoyment of the things reserved. It carries with it the power to construct dams or other works upon or across the bed of the river in order that the public might enjoy the rights of irrigation or other use of the waters."

In some limited situations, the State has title to stream beds which do not meet the test of Article 5302. Prior to the enactment in 1837 of what is now Article 5302, the Spanish and Mexican laws with respect to watercourses were in effect. Under these laws the waters of all streams, regardless of their width, were reserved to the State. Heard v. Town of Refugio, supra; State v. Bradford, supra, at page 1073.

We recognize that it is most difficult in many cases to determine whether the stream bed is owned by the State at a particular location, and whether, therefore, Article 7500a applies; however, we understand that most of these flood retarding structures will be built on small tributaries high up in the watershed. Since the thirty foot average width test of Article 5302 applies only from the mouth of the particular tributary in question, the determination may not be too complex. In situations where the stream bed is not the property of the State, Article 7500a would exempt the appropriative permit requirement: (a) where the governmental body owning the structure owns the property or has an easement for the structure, (b) the storage feature of the

structure has a capacity of not more than 200 acre-feet, and (c) the water stored is to be used for domestic and livestock purposes only. If, however, more than 200 acre-feet will be stored or if the water be beneficially used other than for livestock or domestic purposes, an appropriative permit is required.

## CONCLUSIONS

From the foregoing, the answer to your questions 1 through 4 is: Approval by the Board of Water Engineers is required in all cases regardless of the character of the sponsor:

(a) Where an appropriation permit is required under situations involving "storage" of water on watercourses in reservoirs or additions to reservoirs not excepted by Article 7500a, V.C.S.; or

(b) Where bonds are issued by a water improvement district, water control and improvement district, or fresh water supply district for purposes other than those for which preliminary bonds may be properly used.

In our opinion, the answer to your question number 5 is: Approval by the Board of Water Engineers of the plan and design of a drainage district is required only where: (a) such plans include structures involving "storage" not exempted by Article 7500a, and would thus require an appropriation permit from the Board of Water Engineers, or (b) where bonds other than preliminary bonds are issued by a water control and improvement district.

## SUMMARY

On streams which are "watercourses", a permit to appropriate water is required in all cases where storage structures not excepted under Article 7500a, V.C.S., are erected, regardless of the character of the sponsor. Flood retarding structures of the type described in the body of the opinion providing storage of not more than 200 acre-feet for livestock and domestic purposes do not require an appropriation permit unless constructed on a navigable stream or other stream to which the State has title. Where a ravine, swale or other drainage course is involved rather than a "watercourse", no appropriative permit is required. The Board of Water Engineers is required to approve

watershed plans and the design and specifications of individual structures in such plans where bonds are issued by a water improvement district, water control and improvement district, or fresh water supply district for purposes other than those for which preliminary bonds may be properly issued. The Board of Water Engineers is not required to approve county bonds issued for creating a drainage district.

Very truly yours,

WILL WILSON
Attorney General of Texas

By

Houghton Brownlee, Jr.
Assistant

HB:tiw

APPROVED:
OPINION COMMITTEE:
H. Grady Chandler, Chairman
J. Arthur Sandlin
Richard Stone
B. H. Timmins, Jr.

REVIEWED FOR THE ATTORNEY GENERAL
BY: Geo. P. Blackburn

---

* Watershed Protection and Flood Prevention Act (P.L. 566, 83rd Cong.; 68 Stat. 666), as amended by the Act of August 7, 1956, (P.L. 1018, 84th Cong.; 70 Stat. 1088).