[No. 50778–3.   En Banc.   March 27, 1986.]

WILLIAM M. DICKINSON, *Petitioner,* v. ERSEL C. EDWARDS, ET AL, *Defendants,* KAISER ALUMINUM & CHEMICAL CORPORATION, ET AL, *Respondents.*

458

*Paine, Hamblen, Coffin & Brooke,* by *James M. Kalamon* and *Diane M. Hermanson,* for petitioner.

*Winston & Cashatt* and *Meriwether D. Williams,* for respondent Kaiser Aluminum and Chemical Corp.

*Turner, Stoeve, Gagliardi & Goss,* by *Gail K. Holden* and *J. Scott Miller,* for respondent Spokane Red Lion Motor Inn.

BRACHTENBACH, J.—This case is an appeal from a summary judgment dismissing an action against Spokane Red Lion Motor Inn and Kaiser Aluminum & Chemical Corporation for negligent furnishing and serving of alcoholic beverages to a Kaiser employee attending a banquet at the Red Lion Inn and against Kaiser on the basis of vicarious liability for the negligent action of the Kaiser employee. We reverse the Court of Appeals, *Dickinson v. Edwards,* 37 Wn. App. 834, 682 P.2d 971 (1984), and remand for trial.

On June 22, 1979, the plaintiff was severely injured when the motorcycle he was driving was struck by a car driven up the wrong way on a freeway off ramp by Ersel C. Edwards. Mr. Edwards was cited for driving while intoxicated. Plaintiff subsequently sued Mr. Edwards, Mr. Edwards' employer, Kaiser, and the Red Lion Inn.

Pretrial discovery revealed that on the evening of the accident, Mr. Edwards had attended a banquet provided by Kaiser to honor its long–term employees. The banquet was held at the Red Lion Inn. At the banquet, Kaiser provided not only dinner, but also champagne, wine and mixed drinks. Kaiser paid for the use of the facilities, service and all of the food and beverages. All of the expenses were deducted by Kaiser on its federal income tax return as a business expense. The banquet order stated that the ser-

vers were to "keep the glasses filled." It is unclear from the record whether this was a direction from the Kaiser employee who arranged the banquet or whether it originated with a Red Lion Inn employee.

In his deposition, Mr. Edwards stated that he arrived at 6:50 p.m. and by the time dinner was over at 8:30 p.m. he had consumed at least 10 drinks (Black Velvet or Canadian Club on the rocks). Mr. Edwards stated that he continued to drink at a slightly slower pace until he left the banquet at 10:20 p.m. When Mr. Edwards left the banquet he was proceeding toward the Kaiser plant in order to work his night shift. The accident occurred at approximately 10:25 p.m.

The depositions of two Kaiser employees were available to the trial court. Both employees stated that Mr. Edwards did not appear intoxicated when they had spoken with him between 9 and 9:30 p.m. One of the employees, the head of the Kaiser plant, said that the banquet was a voluntary social function for the employees.

Plaintiff submitted the affidavit of the officer who investigated the accident. The officer approached Mr. Edwards at the scene of the accident at approximately 10:30 p.m. He stated that Mr. Edwards was unsteady on his feet, had bloodshot eyes and a flushed face, and smelled of alcohol. Mr. Edwards failed to perform physical tests to the officer's satisfaction. All of these factors lead to the officer's conclusion that Mr. Edwards was "obviously intoxicated". A Breathalyzer test given 1 hour later indicated that Mr. Edwards had a .17 percent blood alcohol reading.

No depositions of the Red Lion Inn staff were submitted by either party. An instruction sheet prepared by a Red Lion Inn employee indicates that all drinks were to be "hosted", that is, served by a Red Lion Inn waitress or waiter and paid for by Kaiser.

Kaiser's and Red Lion Inn's motions for summary judgment were granted. The Court of Appeals affirmed and plaintiff appeals. Only Red Lion Inn and Kaiser are parties to this appeal.

## I

Plaintiff first premises liability on the theory that Kaiser and the Red Lion Inn were negligent in furnishing alcohol to an obviously intoxicated person. In 1969, Washington adopted the general common law rule of nonliability for furnishing intoxicants to able–bodied persons. *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 458 P.2d 897 (1969). In *Halvorson*, the court recognized that some exceptions to the general rule might exist and since then an action has been recognized where the liquor is furnished to persons who are obviously intoxicated, helpless, or in a special relationship to the furnisher of the intoxicants. *Young v. Caravan Corp.*, 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983); *Wilson v. Steinbach*, 98 Wn.2d 434, 656 P.2d 1030 (1982). In recognizing this cause of action, the court's analysis of proximate cause changed from "the *drinking* of the liquor is the proximate cause of the injury" to "the *furnishing* of the liquor is the proximate cause of the injury."

█ Summary judgment is appropriate under this rule if the pleadings, affidavits, and depositions before the trial court demonstrate that there is no genuine factual issue as to whether the drinker was obviously intoxicated when he was last furnished liquor. CR 56(c); *Wilson*, at 437; *Shelby v. Keck*, 85 Wn.2d 911, 541 P.2d 365 (1975). On review of the dismissal by summary judgment, in this case, we must accept as verities each of the affidavits and deposition testimony and must consider all facts submitted and all reasonable inferences therefrom in the light most favorable to the plaintiff. *Young*, at 657. An inference is "'[a] process of reasoning by which a fact or proposition sought to be established is deduced as a *logical consequence* from other facts, or a state of facts, already proved or admitted.'" *Shelby*, at 914–15 (citing Black's Law Dictionary 917 (4th ed. 1968)). It is not the court's function to resolve existing factual issues nor can the court resolve a genuine issue of credibility such as is raised by reasonable contradictory or impeaching evidence. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 618 P.2d 96 (1980); *Balise v. Underwood*, 62

Wn.2d 195, 381 P.2d 966 (1963); *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 88 L. Ed. 967, 64 S. Ct. 724 (1944).

In the present case, the trial court found that based on the materials before it, there was not evidence upon which to base a material question of fact as to whether Mr. Edwards was obviously intoxicated, helpless, or unable to exercise free will in choosing to drink at the time that he was served liquor at the banquet. The Court of Appeals, in affirming the trial court, did not consider the statement of the officer who observed Mr. Edwards 10 minutes after he left the banquet, nor did it consider the evidence of the amount of liquor Mr. Edwards consumed at the banquet. Instead, the court considered only the affidavits of the Kaiser employees at the banquet and concluded that no factual issue was present as to Mr. Edwards' obvious intoxication when last served at the banquet.

In ignoring the additional evidence, the Court of Appeals relied on an incorrect interpretation of the rule set forth in *Wilson v. Steinbach, supra,* and cases cited therein. This court stated that

> [t]he settled rule in this state as to actions based on the *Halvorson* line of cases is that a person's sobriety must be judged by the way she appeared to those around her, not by what a blood alcohol test may subsequently reveal.

*Wilson,* at 439. The line of cases which established this rule was concerned primarily with the use of evidence from which an inference of the obviousness of intoxication at the time of service could not properly have been drawn. The court in *Wilson v. Steinbach, supra, Shelby v. Keck, supra,* and *Barrie v. Hosts of Am., Inc., supra,* was concerned with the use of the blood alcohol content to prove that the drinker's intoxication was obvious when last served. The *Barrie* court concluded that the obviousness of the drinker's intoxication could not be inferred from a .29 percent blood alcohol content when the tortfeasor's whereabouts were unaccounted for during the 2 hours before the

accident. *Barrie,* at 643 n.1.

In *Shelby v. Keck, supra,* the court was concerned that the use of the blood alcohol reading would lead to an application of a theory of strict liability against one who furnished liquor whenever a patron commits a tort while intoxicated. The *Shelby* court concluded that the blood alcohol content, as evidence of intoxication at the time of the accident, did not raise an inference that the intoxicated tortfeasor was obviously intoxicated when served, when the only other evidence is testimony of those who observed the tortfeasor firsthand and indicated that he was not obviously intoxicated. In *Wilson v. Steinbach, supra,* the court similarly concluded that the evidence of a .19 percent blood alcohol content did not raise an inference of obvious intoxication when the only firsthand observers before the drinker's death testified she did not appear intoxicated.

These three cases are indicative of the court's concern that blood alcohol content be used only as evidence of intoxication at the time of the accident and not as evidence of the obviousness of intoxication at the time of alcohol service. When the obviousness of intoxication is at issue, firsthand observations and other circumstances from which such obviousness can be inferred are most valuable to the court. Therefore, while the Court of Appeals was correct in not considering the Breathalyzer test results as proper evidence in this case, it erred in failing to consider the statement of the officer and the amount of alcohol furnished by the Red Lion Inn waitresses and waiters.

None of the *Halvorson*–type cases, thus far considered by this court, have involved either statements of firsthand observations made within a very short time *after* service of alcohol or an admission by the drinker of gross overconsumption of alcohol. In *Barrie v. Hosts of Am., Inc., supra,* we considered the affidavit of plaintiff's attorney which stated that a cocktail waitress had originally told him that the decedent appeared intoxicated. We concluded that although this affidavit may be used to impeach the later contradictory statement of the waitress, it cannot create, by

itself, a genuine issue of fact for purposes of summary judgment. Here, we consider the affidavit of the investigating officer which is based, not on hearsay, but on testimonial knowledge. In *Young v. Caravan Corp., supra,* we considered the affidavit of a cocktail waitress who stated that the decedent was substantially affected by alcohol and was beyond the point of self–control of his consumption of alcohol. These observations which were made *before* or *during* service of alcohol were held sufficient to present a factual issue as to whether the decedent was obviously intoxicated.

In the present case, the statement of the investigating officer is clearly from one who observed Mr. Edwards' behavior firsthand. The fact that the observations were made 10 minutes after the banquet is of no consequence on a motion for summary judgment. It is of little use to set a specific time period within which the observations must be made. Instead, the trial court, in ruling on the motion for summary judgment, must consider whether the drinker had consumed any alcohol after and independent of the defendants' furnishing or whether any time remained unaccounted for between the last furnishing by the defendants and the subsequent observations. In either of these cases, the subsequent observations may not raise an inference of obvious intoxication upon which to base a material issue of fact. Otherwise, subjective observations of obvious intoxication made in close time proximity to the period of alcohol consumption may raise an inference of obvious intoxication upon which to base a material question of fact. *Elsperman v. Plump,* 446 N.E.2d 1027 (Ind. Ct. App. 1983); *Couts v. Ghion,* 281 Pa. Super. 135, 421 A.2d 1184 (1980); *Jardine v. Upper Darby Lodge 1973,* 413 Pa. 626, 198 A.2d 550 (1964). To hold differently would unfairly deprive the plaintiff and the court of useful evidence and possibly limit the plaintiff to evidence obtained from those, such as tavern owners, employees and others, who may have an interest in the outcome of the litigation.

In addition, the amount of liquor admittedly con-

sumed by Mr. Edwards raises an inference of obvious intoxication upon which to base a material question of fact. Mr. Edwards admitted to 10 drinks before dinner and slightly fewer than that in the time between dinner and 10:20 p.m. The admitted fact, therefore, is that Mr. Edwards was served between 15 and 20 drinks in a 3½-hour period. A logical consequence, *i.e.*, an inference, from this fact, is that Mr. Edwards could have at the very least appeared obviously intoxicated to those who furnished the drinks. Questions with respect to this material issue of fact are the number of employees serving Mr. Edwards; the number of drinks served by any one employee; whether any of these employees or Kaiser supervisory employees observed signs of obvious intoxication; whether Mr. Edwards was a heavy drinker who could consume one mixed drink per 10 to 13 minutes for 3½ hours and still appear sober; and whether the testimony of the Kaiser employees is credible testimony in light of their relationship to one of the parties of this litigation and in light of the conflicting testimony of the investigating officer and Mr. Edwards himself. Evidence of the amount of alcohol consumed differs from evidence of the blood alcohol content in that the number of drinks served and consumed relates not to the level of intoxication but to the question of whether the intoxication was obvious or should have been obvious to the furnishers. Other courts have held that evidence of the amount of alcohol consumed may raise a substantial issue of fact as to whether a person in the position of the drinker would have displayed some outward manifestation of intoxication in advance of ordering. *Elsperman v. Plump, supra; Cimino v. Milford Keg, Inc.,* 385 Mass. 323, 431 N.E.2d 920 (1982) (6 or more white russians in a 5–hour period); *O'Hanley v. Ninety–Nine, Inc.,* 12 Mass. App. Ct. 64, 421 N.E.2d 1217 (1981) (15 beers or 6 martinis); *Couts v. Ghion, supra* (10 drinks in 1½ hours); *Fishermen's Mktg. Ass'n v. Wilson,* 279 Or. 259, 566 P.2d 897 (1977) (8 beers in 2 hours). We hold that the evidence of the amount of alcohol consumed here raises a material

issue of fact as to (1) whether a person in the position of Mr. Edwards would have displayed some outward manifestation of intoxication in advance of ordering and (2) whether a person in the position of the furnisher, either Red Lion Inn or Kaiser, knew or should have known in the exercise of reasonable care, that the drinker was intoxicated.

■ Under this common law negligence theory, in addition to "obvious intoxication", the plaintiff must also prove that the defendants are parties to be held liable under the *Halvorson–Young*–type cases. The fact that Red Lion Inn employees did not sell liquor to Edwards and that Kaiser did not serve the alcohol is irrelevant to this action which requires "furnishing" in any manner. The relevant inquiry is who had the authority to deny further service of alcohol when intoxication became apparent. *Halligan v. Pupo*, 37 Wn. App. 84, 88–89, 678 P.2d 1295 (1984). The fact that each alcoholic drink was "hosted" suggests that the Red Lion Inn could have denied service to the individual guests. The fact that Kaiser management was present suggests that Kaiser could have ordered service to be denied. This evidence raises a genuine issue of material fact as to whether the Red Lion Inn and/or Kaiser "furnished" the alcohol.

We do not comment on the potential liability of hosts in a purely social setting.

## II

Plaintiff secondly premises liability on the theory that Kaiser was vicariously liable because Mr. Edwards, an employee, was en route to his job after departing a Kaiser sponsored banquet when he negligently caused injury to the plaintiff. Under Washington law "the doctrine of *respondeat superior* provides, generally, that the master is liable for the acts of his servant committed within the scope or course of his employment." *Nelson v. Broderick & Bascom Rope Co.*, 53 Wn.2d 239, 241, 332 P.2d 460 (1958). Whether an employee was acting within the scope of his employment is an issue of fact which should be considered under the

principles of summary judgment. *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963). Summary judgment is appropriate if, drawing all reasonable inferences from the factual record in favor of the nonmoving party, the affidavits and depositions before the trial court demonstrate that there is no genuine factual issue as to whether the employee was within the scope of employment when the accident occurred. *Balise v. Underwood, supra.*

The test in Washington for determining whether the employee was, at any given time, in the course of his employment, is

> whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, *or* by specific direction of his employer; *or,* as sometimes stated, *whether he was engaged at the time in the furtherance of the employer's interest.*

*Elder v. Cisco Constr. Co.,* 52 Wn.2d 241, 245, 324 P.2d 1082 (1958) (citing *Greene v. St. Paul–Mercury Indem. Co.,* 51 Wn.2d 569, 573, 320 P.2d 311 (1958)). In following this test we have emphasized the importance of the benefit to the employer in the determination of the scope of employment.

Under ordinary circumstances, a workman is not acting in the course of his employment while going to or from work. *Aloha Lumber Corp. v. Department of Labor & Indus.,* 77 Wn.2d 763, 766, 466 P.2d 151 (1970); *Superior Asphalt & Concrete Co. v. Department of Labor & Indus.,* 19 Wn. App. 800, 802, 578 P.2d 59 (1978). There are several exceptions to this general rule, however. Plaintiff relies on *Flavorland Indus., Inc. v. Schumacker,* 32 Wn. App. 428, 647 P.2d 1062 (1982) and argues that this case falls within the "special errand" exception to the "going and coming" rule. The Court of Appeals distinguished *Flavorland* on the basis that the facts in this case do not rise to a similar level of employer involvement. The Court of Appeals noted that the car driven by Mr. Edwards was not owned by Kaiser; that he was not reimbursed for travel expenses; his job description did not require him to socialize; he was not

required to be present at the banquet; and there was not business conducted by Edwards on behalf of Kaiser at the banquet.

The Court of Appeals analysis leads the way into the quagmire of exceptions based on employer involvement. This court has sought to avoid this path by its emphasis on the benefit to the employer rather than on the control or involvement of the employer. We also choose not to interpret *Flavorland* to fall within the "special errand" rule, but for reasons very different from those of the Court of Appeals. Rather than widen the path into the quagmire of exceptions for each new factual setting presented to the court, we set forth a new application of the doctrine of respondeat superior, which may allow a plaintiff to recover from a banquet–hosting employer without damaging the "going and coming" rule.

█ A plaintiff may recover from a banquet–hosting employer if the following prima facie case is proven:

1. The employee consumed alcohol at a party hosted by the employer which was held to further the employer's interest in some way and at which the employee's presence was requested or impliedly or expressly required by the employer.

2. The employee negligently consumed alcohol to the point of intoxication when he knew or should have known he would need to operate a vehicle on some public highway upon leaving the banquet.

3. The employee caused the accident while driving from the banquet.

4. The proximate cause of the accident, the intoxication, occurred at the time the employee negligently consumed the alcohol.

5. Since this banquet was beneficial to the employer who impliedly or expressly required the employee's attendance, the employee negligently consumed this alcohol during the scope of his employment.

The employer is, therefore, vicariously liable under respondeat superior on the ground that the proximate

cause of the accident occurred while the employee was acting within the scope of his employment. This action does not affect the "going and coming" rule since it asserts that the proximate cause of the accident occurred at the banquet, before the employee even attempted to drive away. *See* Comment, *Employer Liability for a Drunken Employee's Actions Following an Office Party: A Cause of Action Under Respondeat Superior,* 19 Cal. W. L. Rev. 107, 137 (1982) and *Chastain v. Litton Sys., Inc.,* 694 F.2d 957 (4th Cir. 1982).

The inquiry, then, is whether the employee was within the scope of employment when he was drinking at the banquet. The initial focus would be on whether the banquet was a purely social function or sufficiently related to the employer's business to bring the employee's attendance within the scope of employment. In the present case the deduction of banquet expenses as a business expense is not alone sufficient to present a question for the jury. However, this fact plus the additional evidence that this type of function was undertaken by Kaiser to enhance employee relations presents a jury question as to whether the banquet was sufficiently for the benefit of Kaiser. The evidence that "employees were encouraged and expected to attend" presents the jury question of whether Edwards' presence was requested or impliedly or expressly required by Kaiser. Therefore, a material issue of fact is raised on whether Edwards was within the scope of employment at the banquet.

Second and third inquiries are whether the employee, Edwards, became intoxicated at the banquet when he knew or should have known he had to drive on the public highway and whether this intoxication was the proximate cause of the subsequent accident.

In this cause of action, the destination of the intoxicated employee after the banquet is obviously irrelevant. The proximate cause of the negligence occurs at the banquet and so we are able to avoid the sometimes very imaginative analysis required under the "special errand" rule.

Kaiser argues that the destination of the intoxicated employee is important because when the destination is the Kaiser workplace, the employee is breaking company drinking policy and, therefore, not within the scope of employment. This assertion is without merit. Restatement (Second) of Agency § 230 (1958) states that "[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment." This court has held that an employer may be liable for the negligent acts of his employee, although such act may be contrary to instructions. *Greene v. St. Paul–Mercury Indem. Co.*, 51 Wn.2d 569, 573, 320 P.2d 311 (1958).

We reverse and remand for proceedings consistent with the principles set forth above.

DORE and GOODLOE, JJ., concur.

UTTER, J. (concurring)—The dissent accuses the majority of drastic departures from sound tort law in three areas. It indicates the majority ignores specific legislative pronouncements, distorts the principle of respondeat superior beyond recognition, and lastly, accuses the majority of imposing an onerous standard of care on any furnisher of alcohol. Examination of the current literature available in this field relating to the even broader area of social host liability throughout the United States indicates the dissent's accusations are not well founded. Comment, *Social Hosts and Drunken Drivers: A Duty To Intervene?*, 133 U. Pa. L. Rev. 867 (1985); Comment, *Recognizing the Liability of Social Hosts Who Knowingly Allow Intoxicated Guests To Drive: Limits to Socially Acceptable Behavior*, 60 Wash. L. Rev. 389 (1985).

The basic concerns of the dissent were addressed and persuasively answered 16 years ago by Justice Finley in a dissent signed by three other Justices in *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 458 P.2d 897 (1969). The 16 years which have elapsed since that decision have made it abundantly clear to the American public that

drunken driving is a tragic and costly problem. As the concluding paragraph in the Washington Law Review article cited above states, at page 406, "Society is becoming progressively less tolerant of drunken driving. We are realizing that social acceptance of driving while intoxicated has played a significant part in its proliferation." This court should not be a part of continuing that no longer acceptable toleration.

It requires no change in already accepted forms of legal analysis to find liability in this case for both Kaiser and Red Lion Inn. It is not even necessary to base a finding of liability on the doctrine of respondeat superior, but liability can be found within the letter and spirit of our past holdings on the liability of furnishers of alcohol and those enjoying a special relationship with the primary tortfeasor. The dissent's catalog of horribles are overstated and inaccurate and a careful reading of the literature and the cases on the subject should result in a finding of liability.

This concurrence seeks to supplement the majority's basis for finding that Kaiser and Red Lion owed a duty of care to the appellant. While excepting social hosts, this court has recognized that a host may owe a duty to the victims of an intoxicated guest who was (1) obviously intoxicated, (2) helpless, or (3) in some special relationship to the host when the host served the guest alcohol. *Wilson v. Steinbach,* 98 Wn.2d 434, 440, 656 P.2d 1030 (1982); *Young v. Caravan Corp.,* 99 Wn.2d 655, 658, 663 P.2d 834, 672 P.2d 1267 (1983); *Halligan v. Pupo,* 37 Wn. App. 84, 89, 678 P.2d 1295 (1984) (suggesting that *Wilson* and *Young* have overruled *Halvorson sub silentio*). This opinion, therefore, seeks to elaborate the court's recent recognition of host liability to third parties.

I

KAISER

Kaiser's duty to protect users of the public highway from the hazard created by its intoxicated guest arises out of (1) the ready foreseeability of the risk created by the party sit-

uation, and (2) the special relationship existing between the employer and employee. *See Wilson,* 98 Wn.2d at 440; *Young,* 99 Wn.2d at 658. The special relationship provides the employer–host with greater than usual control over the potentially dangerous situation which has been created and, thus, provides a basis for narrowing our holding as the majority wishes to do.

The dissent first errs in assuming that the world of hosts is neatly divided into those who would serve liquor for social purposes and those who would serve it for commercial purposes. Because Kaiser is obviously not a commercial purveyor of alcohol, the dissent concludes that the firm must be treated as a social host and thus not responsible for the actions of its employee–guest. See dissent of Durham, J., at 488. To maintain this rigid division, the dissent must skip lightly over the facts outlined by the majority, as well as Justice Finley's observation that "[w]e must ignore the realities of life in the twentieth century if we assume that business benefit is somehow coextensive only with sale for profit." *Halvorson v. Birchfield Boiler, Inc.,* 76 Wn.2d 759, 770–71, 458 P.2d 897 (1969) (Finley, J., dissenting).

As the majority notes, Kaiser declared the costs of this event to be a business expense and deducted them from its federal income tax. Majority, at 459. Were this expense not for a proper business purpose (*e.g.,* maintaining employee morale), not only would Kaiser be liable to the IRS for improperly seeking a deduction, but Kaiser's directors could be subject to shareholder action for failure to act in the corporation's best interests. *See* RCW 23A.08.343; 23A.08.450.

Where a special relationship exists, a party may be obliged to control another's actions for the protection of third parties. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 56, at 383 (5th ed. 1984); Comment, *Social Hosts and Drunken Drivers: A Duty To Intervene?,* 133 U. Pa. L. Rev. 867, 881 (1985). This rule is given direct application in the Restatement's recognition of a master's duty to control his servant's conduct:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
    (a) the servant
        (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
        (ii) is using a chattel of the master, and
    (b) the master
        (i) knows or has reason to know that he has the ability to control his servant, and
        (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1966).

Three observations are in order. (1) The Restatement rule applies only when the servant acts *outside* the scope of his employment. A servant acting within the scope of his employment would be liable under agency principles (comment *a*). (2) Not only does this rule exclude the purely social host from liability, but it also excludes the business host from liability for the actions of his nonservant guests. For example, liability for the actions of a Kaiser vendor attending the party would not attach to Kaiser under this formulation of the rule. It is the special superior–subordinate nature of the master–servant relationship that gives the master–host a more socially acceptable ground for controlling his employee–guest than is possible in most other host–guest situations.[1]

Finally, (3) the rule, in relevant part, requires that liability should attach only if the servant is on the master's premises solely by virtue of his status as a servant. Restatement (Second) of Torts § 317(a)(i) (1966). This last requirement could be argued to preclude Kaiser liability in the present case, but I believe it does not. The basis of

---

[1] It is worth considering, however, that recognizing a more expanded duty, at least among business hosts, might well provide the needed social justification for assuming responsibility for the actions of those guests which one has enabled, and maybe encouraged, to intoxicate themselves.

Kaiser's duty lies not only in the control it could exercise over its employees' drinking behavior and subsequent driving opportunities, but in the foreseeable risk that at least some of those employees would become intoxicated while in Kaiser's control and that they would leave Kaiser's control only to immediately and unreasonably risk the lives, limbs, and property of all whom they met on the road. In this sense, the master has as much control over his intoxicated servant as he has over a servant who is using his master's chattel off the premises. *See* Restatement (Second) of Torts § 317(a)(ii) (1966).

It was out of a "special relation" between a psychiatrist and his dangerous patient that this court recently found the psychiatrist's duty to take "reasonable precautions to protect those who might foreseeably be endangered by [the patient's] drug–related mental problems." *Petersen v. State,* 100 Wn.2d 421, 428–29, 671 P.2d 230 (1983). Comment, *Psychiatrists' Duty To Protect Foreseeably Endangered Third Parties—Petersen v. State, 100 Wn.2d 421, 671 P.2d 230 (1983),* 18 Suffolk U. L. Rev. 879 (1984). In *Petersen,* the psychiatrist knew or should have known his patient was dangerous. He could not, however, be sure that his patient would cease to take his medication and return to his pattern of drug abuse. That Kaiser might well not have known which of its employees would abuse alcohol the night of the party does not necessarily reduce the risk the company could foresee. Kaiser, unlike the psychiatrist in *Petersen,* could be absolutely sure that its employees would have access to alcohol because Kaiser was providing it. Moreover, Kaiser's control over its employee was much more direct and immediate than was the State's control over its patient.

Kaiser could not argue that it had no reason to believe that any of its employees were of the type to abuse alcohol. Approximately 10 percent of adult Americans are either alcoholics or experience some problems with their drink–

ing.[2] United States Department of Health and Human Services, *Alcohol and Health* (Jan. 1981). Moreover, a majority of executives sampled in one survey reported that their organizations have programs to identify and treat the problem drinker. Even if Kaiser does not have such programs, it cannot be blind to the costs to business of alcohol abuse and alcoholism. In 1975, the amount was estimated to be almost $20 billion for lost production alone. *Alcohol and Health.*

If the plethora of studies on the subject of the intoxicated driver, *see, e.g., Driving While Impaired: Demographic Estimates and Projections,* prepared by the Center for Studies in Demography and Ecology, University of Washington (1984) (includes selected bibliography), has not made virtually everyone in this society aware of the *growing* problem of the drunk driver, the frequent media blitzes should have succeeded. In light of the facts of this case, it should also be noted that many of these advertising campaigns have stressed the responsibility of the host to either control his guest's drinking or prevent the guest from driving.

While Kaiser might not have been able to identify all the potentially dangerous employee–drivers, it could foresee that by so generously providing its guests with all they wished to drink, it would actively create a situation of risk giving rise to a duty of care if it continued to serve alcohol to an obviously intoxicated guest. *See* Comment, *Recognizing the Liability of Social Hosts Who Knowingly Allow Intoxicated Guests To Drive: Limits to Socially Acceptable Behavior,* 60 Wash. L. Rev. 389, 400 (1985).

Not only was Kaiser in the position to foresee the poten-

---

[2]This does not include those individuals who have occasionally become intoxicated, but do not suffer chronic drinking problems or genuine alcoholism. That this number is exceptionally large is suggested, not only by intuition, but by the fact that only 10 percent of drunk drivers in fatal accidents and 20 percent of drivers in less serious accidents have a previous DWI arrest. D. Reed, *Dealing With the Drinking Driving Problem,* 7 Alcohol Health & Research World 4, 7 (1982).

tial hazards of its own conviviality, the means by which the firm could exercise its control over its less responsible employees were ready at hand. It could have instructed Red Lion Inn to monitor more closely the guests' consumption, or hired others to do that monitoring. If Kaiser felt that it did not have the expertise to detect intoxication in its employees it could have hired others with that expertise (*e.g.*, off–duty police officers) and written that expense off as a business deduction as well as they did the cost of the alcohol and other related expenses. It could also have rented a machine to test blood alcohol as employees left the party. Finally, it could have provided intoxicated guests with alternate transportation so they would not have to drive home.

The simplicity and relative inexpensiveness of some of these steps suggest a duty in much the same manner that the existence of the simple glaucoma test led us to find the failure to routinely use it to be negligence, even though that was not then the standard of the profession. *Helling v. Carey*, 83 Wn.2d 514, 518–19, 519 P.2d 981, 67 A.L.R.3d 175 (1974). Where the burden of prevention is small compared to the probability and magnitude of the foreseeable harm, the failure to provide the preventative measures cannot be excused. *See The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1982) (Hand, J.).

## II
### RED LION

The dissent envisions a parade of horribles resulting from recognizing Red Lion's possible liability. This vision, however, both distorts the majority's holding and overstates the burden to the liquor–serving industry. The thrust of the dissent's objections, however, is that the court's holding renders "meaningless" our established standard of "obvious intoxication." Dissent of Durham, J., at 495. The implication seems to be that the observations of a neutral and knowledgeable observer, as well as the admission of the defendant driver, should be excluded from jury considera-

tion, while the unavoidably self–serving statements of the defendant server, or its agent, are allowed to determine whether plaintiff is to be nonsuited. *See, e.g.,* Comment, *Kelly v. Gwinnell: The Social Host and His Visibly Intoxicated Guest: Joint Liability for Injuries to Third Parties and Proper Evidentiary Tests,* 60 Notre Dame L. Rev. 191, 213 n.136 (1984). What employee is going to be ignorant of the possible consequences to himself, as well as to his employer, should he admit that the patron was obviously intoxicated when he served him?[3]

By admitting the testimony of the police officer about the defendant's obvious physical signs of intoxication and the testimony of the defendant driver, the court concededly creates a constructive knowledge standard to supplement the basic "obviously intoxicated" standard. Without this supplement, however, the obviously intoxicated standard would become a sham. The responsibility of commercial purveyors of liquors when they serve obviously intoxicated persons would be limited to the peculiar facts of *Young v. Caravan Corp.,* 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983). Defendants, such as Red Lion, would have every incentive to discourage their servers from learning to recognize the signs of alcohol impairment, as well as ignoring the obvious hazard created by anyone who consumes 15 to 20 drinks in 3 to 4 hours. The dissent unfairly declares the majority to state that commercial purveyors of alcohol must always be liable when their intoxicated patrons are subsequently recognized as such by a police officer. Instead, the majority only declares that such providers will not always be immune to such liability.

The dissent also raises the spectre of an industry crippled by the majority's "Draconian standard of care". Dissent of Durham, J., at 495. While overstated, the dissent's

---

[3]It is noteworthy that the defendant's summary judgment motion in *Young* was denied because of admissions made by the rare employee whose interests were not identified exclusively with the plaintiff. Seldom, however, will the plaintiff be able to prevail upon a defendant server's agent who is also the victim's girl friend. *See Young,* at 658.

concern should be addressed. Red Lion's duty should be limited to taking "reasonable steps" to avoid serving the obviously intoxicated guest or to prevent the already intoxicated guest from driving. The nature of those steps would involve a jury determination based on the purveyor's financial and human resources. *See, e.g.,* 60 Wash. L. Rev. at 402–04. "Commercial vendors or business organizations that serve alcohol at large social functions can reasonably hire 'bouncers,' provide alternative means of transportation [*e.g.,* aeroporter vans] for intoxicated persons, or provide facilities for intoxicated individuals to 'sleep it off.'" 60 Wash. L. Rev. at 403. It should be noted that these costs could be passed on to the sponsor of the function who may, in turn, deduct them in the same manner, and for the same reasons, as it could deduct the expense of the liquor itself.

The dissent fears that admitting the officer's testimony will require of servers the same practiced eye for intoxicated behavior that is found in a police officer. While hiring off–duty policemen for such a purpose is hardly a surprising notion, it is possible to train the servers themselves to more carefully and expertly watch for signs of intoxication; the Washington State Patrol is an obvious resource in this endeavor. At this stage of the proceedings, however, one can only wonder whether the servers' attention, directed to empty glasses, was similarly directed to spotting the abusers of such generous libations.

Nor does admitting the officer's testimony require a finding of per se liability. Defense counsel is free to impeach the officer's testimony by pointing out that each individual absorbs and eliminates alcohol at various rates. *See* Comment, *Kelly v. Gwinnell: The Social Host and His Visibly Intoxicated Guest: Joint Liability for Injuries to Third Parties and Proper Evidentiary Tests,* 60 Notre Dame L. Rev. 191, 208–10 (1984). As the time increases between when the host last served the guest and the officer confronted the guest and as the amount consumed is found to be less, the officer's testimony should be afforded less weight by the jury. It is justice of the blindest sort, how-

ever, to nonsuit the plaintiff because a trained, disinterested party's observations, made just 10 minutes after the intoxicated guest left the party, are held to be inadmissible. Juries are more than capable of assessing the weight of these observations.

The dissent also mischaracterizes the majority as requiring "furnishers affirmatively to refrain from serving patrons more than an undesignated number of drinks." Dissent of Durham, J., at 495. The majority has adequately addressed the qualifications to be considered in this material issue of fact. See majority, at 465. It should be noted, however, that a guest's extraordinarily high consumption of alcoholic drinks should, at least, alert servers to the need to more closely scrutinize the guests' behavior for signs of intoxication. While a variety of factors affect an individual's response to alcohol, the Washington Traffic Safety Commission has provided some reasonable rules of thumb for this purpose. See Wash. Traffic Safety Comm'n, *The New Law is Tough* (June 1983) (brochure).

Commercial purveyors of alcohol reap considerable profits and should not be allowed to blink at the risk that arises from their profit–making activities. This is especially true where, as here, those who consume the alcohol do not have to pay for it. Such a situation is an open invitation to alcohol abuse, with the necessary consequence that the abuser will attempt to drive home. By recognizing that the provider of alcohol shares in the responsibility for the intoxicated guests' subsequent torts, this court does not provide a mechanism for absolving the guest–driver in favor of his deep pocket host. Moreover, the host or purveyor can seek contribution based on the comparative fault of the other tortfeasors and their insurers. RCW 4.22.040. By recognizing the host and the purveyor's shared liability, the court creates a significant and effective incentive to control the harm caused by drunk driving. Moreover, those with the most to gain from the serving of alcohol have a greater incentive to insure against the hazards the activity creates.

## III
### The Court's Role in Determining
### the Law of Torts

The court is extending, but not creating, a cause of action. In *Young v. Caravan Corp.*, 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983), we found a tavern keeper who violated the statute prohibiting the sale of alcohol to minors to be per se negligent. 99 Wn.2d at 660. The court recognized that the immaturity of minors precluded their being able to drink responsibly. Implicit in this use of a legislative standard of conduct is the general recognition that (1) the sale of alcohol to minors creates an obvious and foreseeable risk both to the minors and to the potential victims of their incapacitated actions, and (2) that the one who furnishes the alcohol is in the position to control that risk by denying access to the dangerous chemical.

The same foreseeability of the risk and the capacity to control that risk provide the implicit grounds for the court's finding of a duty in the present case. Moreover, the basis for the defendant's control of the risk rests in its special relation to its employee–tortfeasor. Hence, this court is giving specific content to the *Halvorson* exception that would allow the attachment of liability on the basis of a "special relationship", *Young v. Caravan Corp.*, 99 Wn.2d at 658 (quoting *Wilson v. Steinbach*, 98 Wn.2d 434, 438, 656 P.2d 1030 (1982)); *see also Petersen v. State*, 100 Wn.2d 421, 422, 671 P.2d 230 (1983) combined with a finding of "obvious drunkenness."[4]

Even if this recognition of liability were not the logical extension of principles we have announced in earlier deci-

---

[4]From the *Young* and *Wilson* opinions, one would expect that the finding of a special relationship alone would be sufficient grounds for attaching liability; that, however, would amount to a finding of strict liability which I would not advocate. Along this same vein, the dissent's concern that RCW 66.44.270 does not apply to gratuitous *furnishers* of alcohol to apparently intoxicated adults is misplaced. Obviously, the statute cannot provide a basis for attaching per se liability in such situations. The majority, however, does not find per se liability, but only the basis for an ordinary negligence action that is unrelated to the statute.

sions, we would be abdicating our duty to "reform the common law to meet the evolving standards of justice." *Ueland v. Pengo Hydra–Pull Corp.,* 103 Wn.2d 131, 136, 691 P.2d 190 (1984) (finding children have separate cause of action for loss of parental consortium due to another's negligent acts). Tort law should continually discourage unreasonable activities, W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 4, at 25–26 (5th ed. 1984), and seek to apportion the risk of loss due to hazardous activities among those responsible for the activities. *Prosser and Keeton* § 1, at 6.

We are not arrogating to the court what is appropriately a legislative matter, since the Legislature is not given to consistent reevaluations of tort law. Peck, *The Role of the Courts and Legislatures in the Reform of Tort Law,* 48 Minn. L. Rev. 265, 290–91 (1963). Furthermore, the *Halvorson* rule of nonliability for liquor purveyors, as well as its subsequent exceptions, are court created. 60 Wash. L. Rev. at 397 n.68 (citing *Halvorson*). By responding now, however, this court can complement the efforts of the legislative branch by apprising it of a matter which it appears to have ignored. As one observer has noted, the 1983 amendments to Washington's DWI laws do not preempt the range of sanctions available against the drunk driver; the Legislature was only concerned that its sanctions not be supplanted. 60 Wash. L. Rev. at 398 n.71. Where there "is no statutory sanction for the absolute rule of immunity" and the reasons for granting immunity are wanting, "[t]he true role of the legislature . . . is to restrict liability if it chooses to do so . . ." *Borst v. Borst,* 41 Wn.2d 642, 657, 251 P.2d 149 (1952) (striking down parental immunity where the parent's tort arises out of a nonparental transaction with the child).

While I can concede to the dissent that the majority's use of respondeat superior is an extension of the doctrine, I find other compelling grounds for making the employer liable to the third party victims of his employee. As I have discussed above, I disagree sharply, however, with the

dissent's other conclusions. (1) Our present holding is firmly rooted in our past holdings on the liability of (a) furnishers of alcohol and (b) those enjoying a special relationship with the primary tortfeasor. *See Wilson, Young,* and *Petersen.* (2) That the Legislature has declined to declare business hosts and purveyors of alcohol per se liable to third parties for the intoxicated guests' negligent driving hardly forecloses the possibility of a common negligence action. (3) The list of relatively simple and inexpensive remedies, while not exhaustive, can hardly pose the death knell for the liquor–serving industry, especially if the server's financial and human resources determine the range of steps that are reasonably expected. (4) The court can specifically exclude the social host from liability and can hardly be said to require of *any* host "an exact tabulation of drinks consumed or face liability". Dissent of Durham, J., at 496. (5) Finally, the spreading of the risk to others who stand to gain financially, directly or indirectly, by the guests' excessive consumption can hardly be called an imposition of responsibility on those who "can be as innocent as the victim." Dissent of Durham, J., at 496.

PEARSON and GOODLOE, JJ., concur with UTTER, J.

CALLOW, J. (dissenting)—I agree with the sentiment that a corporation or individual who serves liquor to a person obviously intoxicated at a gathering convened for a business purpose should have a responsibility to see that those served do not leave the gathering in an intoxicated condition. However, the body to impose such a responsibility and ultimate liability is the Legislature, not this court. Therefore, I dissent.

For 50 years, from 1905 to 1955, the Legislature set the standard of duty of responsibility of those who gave or sold liquor to persons who thereby became intoxicated and injured others. The right of action for damages in a civil suit against the person who furnished the liquor was permitted if the injured party could prove that the liquor was

sold under circumstances which would lead the furnisher to believe that the sale would result in intoxication. In 1955 this duty was abolished by the Legislature.

In 37 Wash. L. Rev. 263 (1962), the Comment entitled *Tavernkeeper's Liability for Act of Guest* stated at pages 267–68:

Another theory of negligence might have been argued by the plaintiff, even in absence of any showing of knowledge by the defendants of the vicious propensities of any specific patron: to impose liability through the device of a Washington statute making the furnishing of intoxicating liquor to one known to be intoxicated a misdemeanor.[21] This criminal statute has never been made a basis for civil liability of a tavernkeeper in Washington for torts of an intoxicated patron. However in two jurisdictions it has been held that such a statute imposed a duty, the breach of which was held to be imprudent conduct and was the proximate cause of injury to a third party by the intoxicated patron. Both cases involved the liability of a tavernkeeper for injuries sustained in an automobile collision caused by the negligence of the intoxicated patron. It is clear that for such a theory to operate the statute must be construed to confer a private rather than merely a public benefit and the act resulting in harm must have been a result of intoxication.

Thus, if the plaintiff could prove that the affray was caused by the defendants' breach of statutory duty and the harm to the plaintiff was within the forseeable risk created by the breach of that duty, recovery might have been had on this theory. There is an historical hurdle that must be overcome to fasten liability with such reasoning, in addition to finding a private benefit conferred by the criminal statute. At common law serving intoxicating liquor was not the proximate cause of injury resulting from intoxication. Rather the voluntary drinking of the intoxicant was the legal cause of the risk resulting in eventual injury. This common law immunity of the tavernkeeper has given rise to various dram–shop acts, imposing liability the tavernkeeper would otherwise escape. In the great majority of states today the mere sale of intoxicating liquor gives rise to no cause of action, even though the sale was in violation of some law other than an applicable dram–shop act.[26]

[21]RCW 66.44.230 applies to one that is an ". . . owner or manager of, or an employee in any drinking saloon, drinking celler [sic] or public dance hall or music hall where intoxicating liquors are sold or kept for sale." RCW 66.44.200 states: "No person shall sell any liquor to any person apparently under the influence of liquor."

[26]Wash. Sess. Laws 1905, ch. 62, § 1, imposing civil liability on Washington Tavernkeepers, was repealed in 1955 by RCW 4.24.100. It may be argued that this repeal of the Washington "dram–shop" act is an expression of legislative intent to not confer a private benefit from the duty imposed by RCW 66.44.200 and RCW 66.44.230. Yet, the opposite conclusion was reached in Rappaport v. Nichols, 31 N.J. 188, 156 A.2d 1 (1959), where the New Jersey "dram–shop" act had also been repealed. Judge Rosellini, concurring in the principal case, implies such a result might be reached in Washington. In quoting from Conolly v. Nicollet Hotel, 259 Minn. 373, 382, 25 N.W.2d 657 at 665 he states: "It is the policy of the law, both statutory and decisional to protect the public from social consequences of intoxicating liquor. There is perhaps no field of business activity more hedged about with state and municipal laws and regulations designed to protect the public. When a person engaged in that business permits crowds to gather upon his premises for profit, he must recognize the risks which flow from the nature of the business." 158 Wash. Dec. 874, 883, 365 P.2d 333, 339 (1961).

(Some footnotes omitted.)

The Legislature repealed the Washington dramshop act in 1955. Then again it acted upon the same subject in 1973 when it repealed RCW 66.44.230. Thus, the Legislature has acted twice within recent years to remove liability from those who furnish liquor and left responsibility squarely upon the shoulders of the consumer. When the Legislature has taken cognizance of an activity and expressed its intent on a subject, this court should not impose its own view.

Further, the rule now announced by the court changes the standard of conduct after the fact. Suddenly Kaiser and the Red Lion discover that each had a duty to supervise and police the conduct of each individual who attended the function. That duty did not exist under the law on the date

in question. Now these defendants are told that they should have acted differently and that they are liable for a failure to act when the Legislature had indicated there was no duty.

In 1933 the Legislature passed the Washington State Liquor Act concerning the monopoly control of the sale, purchase and use of liquor in the state. Laws of 1933, 1st Ex. Sess., ch. 62, p. 173 (now RCW Title 66). The Legislature, rebounding from the vacuum created by prohibition (U.S. Const. amends. 18 and 21), acted to adopt a statutory scheme governing all conduct involving liquor. As noted in RCW 66.08.010:

> This entire title shall be deemed an exercise of the police power of the state, for the protection of the welfare, health, peace, morals, and safety of the people of the state, and all its provisions shall be liberally construed for the accomplishment of that purpose.

This legislative consideration included the relationship between the providers of liquor to consumers and those subsequently injured by the consumer. This is a problem properly addressed by the Legislature. *See State ex rel. Shannon v. Sponburgh*, 66 Wn.2d 135, 139, 401 P.2d 635 (1965); *Ajax v. Gregory*, 177 Wash. 465, 32 P.2d 560 (1934). It involves a number of considerations other than the few parties involved in this case. It involves the way in which hotels, restaurants, taverns, clubs, grocery chains, convenience stores, fraternal organizations and others must act when the service of liquor is involved. The majority excludes social hosts but invites their inclusion. One can anticipate their inclusion as party defendants in suits brought in the future. When multitudinous entities, parties, and concerns are involved, the legislative process is better equipped to reconcile those concerns. When the Legislature has clearly withdrawn a duty, the court should not impose its own view as to proper conduct and morality.

Here (1) the Legislature has indicated its collective judgment in this area; (2) the imposition of liability, after the fact, is unjust and unfair to the defendants; and (3) the

duty of this court is to bring the problem to the attention of the Legislature and permit the Legislature to act or refrain from action as it will.

DOLLIVER, C.J., and ANDERSEN, J., concur with CALLOW, J.

DURHAM, J. (dissenting)—The majority opinion ignores a specific legislative pronouncement, distorts the principle of respondeat superior beyond recognition and imposes an onerous standard of care on any furnisher of alcohol. I cannot agree with these drastic departures from the sound rudiments of tort law, and, therefore, I dissent. The concurring opinion, in its attempt to bolster the majority, creates additional problems and I will address those separately.

I

I turn first to the majority opinion. Because the rationale for affirming the trial court's order granting summary judgment differs for Kaiser and Red Lion, each of the respondents will be considered in turn.

KAISER ALUMINUM

The majority finds that Kaiser is potentially liable under two distinct theories. First, the majority holds that Kaiser can be found liable under a negligence theory because it allowed a guest who was arguably "obviously intoxicated" to be served alcohol at its banquet. Second, according to the majority Kaiser can be found liable, regardless of fault, under a respondeat superior theory for the subsequent negligence of its employee who consumed alcohol to excess at its banquet. Properly analyzed, neither of these theories is applicable.

Under a negligence theory, the following elements must be established:

1. A duty, or obligation, recognized by the law, requiring the person to conform to a certain standard of conduct . . .

2. A failure on the person's part to conform to the standard required: a breach of the duty . . .

3. A reasonably close causal connection between the conduct and the resulting injury . . .

4. Actual loss or damage resulting to the interests of another . . .

W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 30 (5th ed. 1984).

At common law, no cause of action in negligence existed against "one furnishing liquor in favor of those injured by the intoxication of the person so furnished." *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 762, 458 P.2d 897 (1969) (quoting 30 Am. Jur. *Intoxicating Liquors* § 520 (1958)). Courts held that, as a matter of law, the furnishing of the liquor was not sufficiently causally connected to an injury inflicted by the consumer of the alcohol. *Halvorson,* at 762; *State ex rel. Joyce v. Hatfield,* 197 Md. 249, 254, 78 A.2d 754 (1951). As the majority correctly states, Washington courts, in accordance with the weight of authority, have rejected the common law rule and held that the furnishing of liquor can be the proximate cause of a subsequent injury. *Halligan v. Pupo,* 37 Wn. App. 84, 678 P.2d 1295 (1984); *Young v. Caravan Corp.,* 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983). Generally the question of causation in this context is now considered to be one of fact. *Jardine v. Upper Darby Lodge 1973,* 413 Pa. 626, 629–31, 198 A.2d 550 (1964); *Rappaport v. Nichols,* 31 N.J. 188, 203, 156 A.2d 1 (1959). Although the majority correctly summarizes the law as it relates to the element of causation, its conclusory statements demonstrate little understanding of the element of duty.

Without citing authority or attempting to develop a coherent rationale, the majority concludes that one who furnishes liquor "in any manner" to an "obviously intoxicated" person owes a duty to a third party injured by the person so furnished. In so holding, the majority simply ignores precedent. In *Halvorson,* "employers furnished food and refreshments, including alcoholic beverages" at their Christmas party. *Halvorson,* at 760. We found that although a licensed vendor of liquor may be required to

refrain from serving someone whom he knew to have a drinking problem, the employers, as hosts of a social event, owed no such duty. *Halvorson,* at 763–64. Accordingly, we distinguished between a commercial licensee and a social host and held that a noncommercial furnisher of liquor owes no duty to an injured third party. Since *Halvorson,* this court has never found a gratuitous furnisher of alcohol to be liable for injuries resulting from the intoxication of one of his guests.

Kaiser's role as a gratuitous furnisher of alcohol is indistinguishable from the employer's role in *Halvorson.* Kaiser was not a licensed vendor of liquor nor was it selling liquor at a profit. Although enhancement of employee morale may have resulted from the banquet, this supposed business purpose was present in *Halvorson* and, indeed, is present in any social event sponsored by a business for its employees. By finding that Kaiser owes a duty here, the majority summarily departs from the distinction developed in *Halvorson* and, thus, overrules *sub silentio* a critical aspect of the case. Such a major shift in the standard for determining who owes a duty of care should be accompanied by an analysis that includes more than a mere conclusory phrase.

The *Halvorson* rule is strongly supported by other jurisdictions. Irrespective of their ultimate determination of social host liability, other jurisdictions reason that if a distinction between a social and nonsocial host is to be made, the basis for the distinction is if the furnisher sells or intends to make a profit from the alcohol. *See, e.g., Cole v. Spring Lk. Park,* 314 N.W.2d 836, 839 (Minn. 1982); *Ono v. Applegate,* 62 Hawaii 131, 136 n.5, 612 P.2d 533 (1980); *Rappaport v. Nichols,* 31 N.J. at 205–06. Thus, like *Halvorson,* they view a business that sponsors an event for its employees as a social host. *See, e.g., Congini v. Portersville Valve Co.,* 504 Pa. 157, 470 A.2d 515 (1983); *Baird v. Roach, Inc.,* 11 Ohio App. 3d 16, 17, 462 N.E.2d 1229 (1983); *Couts v. Ghion,* 281 Pa. Super. 135, 140–41, 421 A.2d 1184 (1980). The majority rejects this rationale and, without explanation, equates Kaiser with any commercial

vendor of liquor.

The majority attempts to mask the ultimate impact of its holding by purportedly reserving the question of social host liability. However, the inevitable extension of the majority rationale dictates a finding of liability for a social host. The majority bases Kaiser's liability squarely on the fact that Kaiser furnished alcohol. Obviously, any social host who provides alcohol is just as much a furnisher as Kaiser. Indeed, this simple logic led the New Jersey Supreme Court to conclude that the adoption of the furnisher rationale mandated the rejection of the nonliability rule for social hosts. *Kelly v. Gwinnell,* 96 N.J. 538, 547–48, 476 A.2d 1219 (1984). Thus, by imposing liability on any server of alcohol while purporting to reserve the question of social host liability, the majority attempts to disguise the dramatic expansion of liability which must result from its rationale.

In addition to rejecting the distinction articulated in *Halvorson,* the majority opinion ignores a legislative enactment previously relied upon by this court. In *Young v. Caravan Corp.,* 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983), we found that a violation of the Washington State Liquor Act, RCW Title 66, constitutes negligence per se. Specifically, we held that RCW Title 66 provides a basis for imposing a civil duty on commercial vendors to refrain from selling intoxicants to a minor. *Young,* at 660. This duty is owed not only to a minor but to the public generally. *Callan v. O'Neil,* 20 Wn. App. 32, 578 P.2d 890 (1978); *see* RCW 66.08.010. Thus, a third party injured by the intoxicated minor's conduct has an actionable claim against the vendor of the alcohol. *Callan v. O'Neil, supra.*

The Washington State Liquor Act not only prohibits furnishing alcohol to a minor but also forbids selling alcohol to an apparently intoxicated person. When compared, these two provisions clearly demonstrate that liability should not be imposed on Kaiser here. In prohibiting the furnishing of liquor to minors, RCW 66.44.270 provides that "no person shall *give, or otherwise supply* liquor to any person under the age of twenty–one years". (Italics mine.) How-

490

ever, RCW 66.44.200 provides: "No person shall *sell* any liquor to any person apparently under the influence of liquor." (Italics mine.) By including the word "give" in RCW 66.44.270 but omitting it from RCW 66.44.200, a clear legislative choice has been made. Under the act, gratuitous furnishers of alcohol are liable only for furnishing minors, not for furnishing apparently intoxicated adults. Thus the legislative intent is manifest; Kaiser as a gratuitous furnisher of alcohol is exempt from liability here. *See Cole v. Spring Lk. Park, supra* at 839 (deletion of word "give" from obvious intoxication statute evidences legislative intent to preclude liability for nonsellers of alcohol).

Although tort law is often derived from common law, the keenly competing social interests involved here have led other jurisdictions to defer to legislative enactments in resolving the question of duty. *See, e.g., Koback v. Crook,* ___ Wis. 2d ___, 366 N.W.2d 857 (1985); *Lewis v. State,* 256 N.W.2d 181 (Iowa 1977); *Cole v. Spring Lk. Park, supra; Jardine v. Upper Darby Lodge 1973,* 413 Pa. 626, 198 A.2d 550 (1964); *Waynick v. Chicago's Last Dep't Store,* 269 F.2d 322 (7th Cir. 1959). Particularly here where the Legislature has passed an enactment that we have previously determined provides a basis for civil liability, proper deference to the Legislature and the integrity of our prior decisions require us to invoke the statutorily defined duty not only to create, but also to circumscribe, liability.

More analytically obtuse than the rationale for holding Kaiser potentially liable under a negligence theory is the majority's application of the doctrine of respondeat superior.[5] Under the majority analysis, Kaiser is liable, irrespective of its fault, whenever an employee drinks to excess at its social function and then commits a tort with his automobile. Thus, the obvious intoxication standard is no longer a prerequisite to liability in this context. In

---

[5]Referring to Justice Brachtenbach's views in this area as "the majority" may be misleading. The concurring opinion tiptoes gently around the issue without taking a position.

essence, Kaiser's fault, if any, is no longer relevant and strict liability is now the rule.

By imposing strict liability on Kaiser, the majority enacts by judicial fiat what the State Legislature specifically rejected. By Laws of 1955, ch. 372, the Legislature repealed the "Dramshop Act" which provided:

> Every husband, wife, child, parent, guardian, employe, or other person who shall be injured in person or property, or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, of any person, shall have a right of action, in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving intoxicating liquors, have caused the intoxication of such person, for all damages sustained, and the same may be recovered in a civil action in any court of competent jurisdiction. On the trial of such action, the plaintiff or plaintiffs must prove that such intoxicating liquors were sold under circumstances sufficient to lead a man of ordinary intelligence to believe that such sale would probably result in intoxication.

Laws of 1905, ch. 62, § 1, p. 120. Thus, by using the doctrine of respondeat superior here, the majority scoffs at the Legislature's will by arbitrarily reenacting a portion of a repealed statute.

This judicial encroachment into the legislative province cannot be justified as simply an application of a settled common law principle. Despite the majority's contention that they are developing "a new application" of respondeat superior, they are, in actuality, radically altering the doctrine.

Respondeat superior is an agency theory that imposes liability on the master for the tort of his servant committed in the "scope of employment". *Titus v. Tacoma Smeltermen's Union, Local 25*, 62 Wn.2d 461, 469, 383 P.2d 504 (1963); *Nelson v. Broderick & Bascom Rope Co.*, 53 Wn.2d 239, 241, 332 P.2d 460 (1958). Although we have used different wording to articulate when an employee is within the scope of employment, we have always required that a nexus

exist between the employee's activity and the employer's interest before we imposed vicarious liability on an employer. *Elder v. Cisco Constr. Co.,* 52 Wn.2d 241, 324 P.2d 1082 (1958); *Van Court v. Lodge Cab Co.,* 198 Wash. 530, 89 P.2d 206 (1939). We have consistently required that the nexus exist at the time the act that results in injury occurs. *Foote v. Grant,* 55 Wn.2d 797, 800, 350 P.2d 870 (1960); *Roletto v. Department Stores Garage Co.,* 30 Wn.2d 439, 442, 191 P.2d 875 (1948); *Poundstone v. Whitney,* 189 Wash. 494, 501, 65 P.2d 1261 (1937). The majority abandons this fundamental requirement by finding the nexus prior to this time.

In so finding, the majority holds an employer liable for the negligent acts of his employee, even though no employment relationship existed when the act upon which liability is predicated occurred. Here, the employee's liability is based upon the act of driving an automobile in the wrong direction on a freeway off ramp, which resulted in striking a motorcycle and its driver. At the time of the accident, the employee was driving to work in his own automobile. We have consistently recognized that if no business is transacted, an employee is not within the scope of employment while driving to or from work in his automobile. *McNew v. Puget Sound Pulp & Timber Co.,* 37 Wn.2d 495, 499, 224 P.2d 627 (1950); *Roletto v. Department Stores Garage Co., supra.* Thus, the majority finds Kaiser liable based on the agency theory of respondeat superior even though the employee was not an agent when the act resulting in injury occurred.

Indeed, the majority does not even purport to analyze the employee's status as an agent at that time. Instead, it picks a point earlier in time, the banquet. After finding that the employee was within the scope of employment at the time of the banquet, the majority concludes that Kaiser can be held liable for tortious acts committed by the employee after he leaves the banquet. By holding that the determination of agency at the time of the act resulting in injury is irrelevant to finding agency liability, the majority puts the

cart before the horse.

Furthermore, the majority's doctrine imposes patently arbitrary distinctions for determining liability. The majority finds liability only when the employee injures someone while *driving* from the employer's social event. No logical analysis can explain why an employee is more of an agent of the employer when he commits a tort while driving from the banquet than he is when he commits a tort in any other manner while leaving the banquet. The majority also expands the scope of respondeat superior only when an employer hosts a social event. Again, the majority opinion never explains the rationale for finding that employers are more culpable under an agency theory when they host a social event than they are at any other time.

Thus, by adopting the "banquet hosting employer" exception to the doctrine of respondeat superior, the majority reenacts repealed legislation with a logically indefensible analysis that bears no resemblance to the principle of respondeat superior.

### RED LION INN

The majority also holds Red Lion Inn potentially liable for serving alcohol to Kaiser's employee Edwards. As noted above, a furnisher of alcohol is liable only if he sells it to a person who is obviously intoxicated. In defining the obvious intoxication standard, we have required that "a person's sobriety must be judged by the way she appeared to those around her, not by what a blood alcohol test may subsequently reveal." *Wilson v. Steinbach,* 98 Wn.2d 434, 439, 656 P.2d 1030 (1982). In direct contravention to *Wilson's* holding, the majority finds Red Lion potentially liable by considering evidence of intoxication which Red Lion could not have seen. Thus, the majority alters the standard of care that a seller must exercise in determining if a customer is intoxicated. The majority now requires a furnisher to exercise the skill, expertise, and technique of a trained police officer in detecting intoxication. As its analysis of Kaiser's liability abrogates the rule in *Halvorson,* the

majority's analysis of Red Lion's liability abrogates the obvious intoxication standard in *Wilson.*

The majority concedes that the depositions contain no evidence from anyone at the banquet that Edwards was visibly intoxicated. Instead, the majority relies on the statement of the investigating officer made after Edwards left the banquet. However, the officer's conclusions were based on specialized "sobriety tests" designed to detect intoxication. Thus, before concluding that Edwards was intoxicated, the officer directed Edwards to stand with heels together, eyes closed and head tilted back. In this position Edwards was ordered to touch his nose with the index finger of each hand. The officer also directed Edwards to stand first on his right foot alone and then on his left foot alone. Although prior to administering the tests the officer observed that Edwards "appeared unsteady on his feet", the circumstances surrounding that observation had no relation to the setting in which Red Lion observed Edwards. The officer made this observation while Edwards was in the process of standing up after having been in a kneeling position. Red Lion had no opportunity, nor should it be required, to observe Edwards in these wholly unnatural postures.

In *Wilson v. Steinbach, supra,* we held that evidence of a defendant's blood alcohol level was not relevant to a determination of obvious intoxication. Here, Red Lion had no more opportunity to observe Edwards' responses to the field sobriety tests than it had to discover his blood alcohol level. Thus, the majority changes the *Wilson* test from determining intoxication "by the way she appeared to those around her" to determining intoxication by the way one would appear to a trained police officer after undergoing a series of specially designed sobriety tests.

The majority also holds that the amount of alcohol consumed, standing alone, raises a material issue of fact as to Red Lion's liability. The majority states that if a furnisher knew or should have known that a patron was intoxicated, the furnisher can be held liable for injuries inflicted

by the patron. It then concludes that the number of drinks consumed, by itself, raises a material issue of fact as to whether the server knew or should have known a patron was intoxicated. Instead of requiring servers to detect signs of intoxication, the majority now requires furnishers affirmatively to refrain from serving patrons more than an undesignated number of drinks. The mandate of *Wilson v. Steinbach, supra,* that "a person's sobriety must be judged by the way she appeared to those around her" is no longer a prerequisite for liability. In essence, the majority again renders the obvious intoxication standard meaningless.

By so holding, the majority ignores the realities of establishments that serve alcohol. Alcoholic beverages can usually be ordered through a bartender or one of several waiters or waitresses. In addition, patrons often purchase drinks for each other. By what standard must a server gauge the number of drinks he can serve? Perhaps the majority contemplates cocktail waitresses asking each patron's weight, height, unusual medical conditions, time of last meal, drinks consumed at any prior functions, and the like. This presents such establishments with a Hobson's choice. Either they face liability without fault on their part or they must drastically restructure the way they do business. The court far exceeds its proper province by mandating such an absurd change in the way an industry operates.

The obvious intoxication standard of *Wilson v. Steinbach, supra,* imposed an obligation on establishments to which they could be expected to conform. Indeed, if a patron shows signs of intoxication and is served nonetheless, the server is negligent and the imposition of liability is clearly justifiable. However, by holding that an establishment must keep an exact tabulation of the number of drinks a patron consumes, the majority imposes a Draconian standard of care on an entire industry. In doing so, it abolishes the proper balance developed in past decisions between the imposition of a feasible obligation on servers of alcohol and the desire to compensate a victim. The majority ignores the former in their zeal to foster the latter.

Viewed in its totality, the majority opinion develops a rationale that will contort the landscape of social relations in the state. The adoption of the furnisher rationale coupled with the imposition of liability based solely on the number of drinks consumed requires social hosts to actively police their parties. Thus, the majority rationale will have us pry into the privacy of a person's home to ensure that the host of a party counts the drinks of the guests.

None of us doubt the tragic consequences of drunk driving nor do we seek to diminish the efforts of those dedicated to ending the senseless slaughter on the highways. But the majority opinion paints with far too broad a brush. In one fell swoop, and without benefit of law or logic, the majority accomplishes the following:

1. Rejects, sub rosa, two well founded cases of this court, *Halvorson* and *Wilson*;

2. Contorts the doctrine of respondeat superior by applying it to a wholly inapplicable situation;

3. Usurps legislative mandate by judicially reenacting the Dramshop Act and ignoring a controlling statute;

4. Threatens the viability of a legitimate industry by imposing arbitrary, artificial and arcane requirements with which it cannot possibly comply;

5. Transforms a social host into an insurer and ensurer of a guest's sobriety by requiring the host to either keep an exact tabulation of drinks consumed or face liability; and

6. Absolves the real culprit, the drunk driver, by spreading the risk to "furnishers" of alcohol who, under the majority's test, can be as innocent as the victim.

## II

I now turn to the concurring opinion which is yet another exercise in judicial lawmaking. Firmly rooted not in our past holdings, but rather in social philosophy derived from law review articles, the concurrence invents a new theory of liability for employers who furnish alcohol to their adult employees and further erases the "obvious intoxication" standard (completing the job which the majority opinion

started). In its zeal to place the ultimate blame for drunk driving not on the drunk driver, but instead on the furnishers of alcohol, the concurrence would subject both employers and commercial sellers of alcohol to vague and incomprehensible guidelines. It defends this usurpation of the legislative function by asserting that "this court can complement the efforts of the legislative branch by apprising it of a matter which it appears to have ignored." Concurrence, at 481. Given the current high level of public awareness of drunk driving, it seems presumptuous to state that the Legislature has ignored the matter.

I have several objections to the views expressed in the concurrence. First, I find nothing in our prior decisions that justifies treating the employer–employee relationship as a "special relationship" which somehow imposes additional burdens on the employer. In *Young v. Caravan Corp.*, 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267 (1983), we held that the sale of alcohol to minors in violation of a statute was negligence per se; here, however, we are dealing not with minors but rather with mature adults. In apparent desperation, the concurrence turns to *Petersen v. State,* 100 Wn.2d 421, 671 P.2d 230 (1983), to draw what can only be described as a bizarre analogy with the facts of the present case. In *Petersen* we found that a special relationship existed between a psychiatrist and his mental patient because of the latter's blatant dangerous propensities. The mental patient in *Petersen* had been a frequent user of angel dust, had cut off his left testicle, and had been diagnosed as schizophrenic, paranoid and depressive. Thus, we held that the psychiatrist had a duty to take reasonable precautions to protect others from this man's "drug–related mental problems." *Petersen,* at 428–29. I fail to see how one can compare the obvious potential dangers posed in *Petersen* with those posed by typical adult employees at an employer–sponsored party.

After imposing its new duty on employers, the concurrence describes the nature of the duty by using a statistical analysis that virtually erases the obvious intoxication

standard. We are told that since "[a]pproximately 10 percent of adult Americans are either alcoholics or experience some problems with their drinking" (concurrence, at 474–75), the employer can, therefore, constructively "foresee" that any of its employee–drinkers might later injure another person while driving drunk. The employer becomes responsible, in effect, for the actions of every one of its employees even if it cannot detect those who are actually intoxicated. Hence, the concurrence has not only departed from our prior decisions in imposing a new duty on employers, but has also made this duty a particularly onerous one.

The concurrence next submits a laundry list of "reasonable steps" which furnishers of alcohol might take to avoid liability. However, these guidelines are so vague and disorganized that no employer or commercial establishment can accurately determine what actions qualify as "reasonable". Amid this uncertainty, any medium to large business that wishes to serve alcohol at its social functions would literally have to police those events or subject itself to potentially staggering damages in a subsequent lawsuit. Indeed, we are told that employers must "monitor" and "control" their employees, and that commercial establishments are expected to hire bouncers or the Washington State Patrol to accomplish this task.

The rationale for imposing this new array of duties is readily apparent. The concurrence would have us believe that the ultimate blame for the carnage caused by drunk drivers must always lie with the furnishers, rather than the abusers, of alcohol. Commercial establishments serving alcohol are portrayed as amoral entities that will stop at nothing in their quest for profit. ("[O]ne can only wonder whether the servers' attention, directed to empty glasses, was similarly directed to spotting the abusers of such generous libations." Concurrence, at 478.) Employers furnishing alcohol to their employees are portrayed as blithely ignorant of the "potential hazards of [their] own conviviality". Concurrence, at 476. The employees themselves are

treated as mere children who constantly need to be monitored and controlled. Nowhere in the concurrence can one find the concept of individual responsibility—the recognition that in some instances the drunk driver alone should be held responsible for his actions.

As stated earlier, I am very much aware that drunk driving is a tragic and costly problem. Unlike the concurrence, however, I do not believe we should sacrifice the concept of individual responsibility as part of a crusade against furnishers of alcohol. In *Halvorson v. Birchfield Boiler, Inc.,* 76 Wn.2d 759, 458 P.2d 897 (1969), we held that as a general rule, furnishers of alcohol will not be held liable for the actions of drunk drivers. We have since recognized certain limited exceptions to this rule, but we have been careful not to let the exceptions engulf the rule. Should the Legislature wish to reenact the Dramshop Act, it may, of course, do so; we should not, however, arrogate that function to ourselves.

For the foregoing reasons, I must dissent from the views expressed in the majority and concurring opinions. I would affirm the order of the trial court in dismissing the claims against Red Lion and Kaiser.

DOLLIVER, C.J., and ANDERSEN, J., concur with DURHAM, J.

Reconsideration denied August 28, 1986.